640 A.2d 1271

COMMONWEALTH of Pennsylvania, Appellee,

v.

Dennis BAXTER, Appellant.

Supreme Court of Pennsylvania.

Submitted Oct. 18, 1993.

Decided April 25, 1994.

Janis Smarro, Philadelphia, for D. Baxter.

Catherine Marshall, Ronald Eisenberg, Philadelphia, for Com.

Before NIX, C.J., and FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY and CASTILLE, JJ.

## OPINION OF THE COURT

CAPPY, Justice.

In this appeal, the Appellant contends that trial counsel provided ineffective assistance for failing to investigate the background of the Commonwealth's primary witness. Appellant asserts that an investigation would have disclosed that the witness was incarcerated at the time that the Appellant allegedly confessed to him, directly contradicting the witness's testimony that he was at the Appellant's home when the Appellant confessed. We agree that counsel was ineffective and, accordingly, reverse the Order of the Superior Court and remand for a new trial.

On May 16, 1983, cab driver Norman Sokolove was shot in the head and neck as he sat in his taxi. Sokolove died on May 21, 1983. Appellant was arrested on April 2, 1987 and charged with murder and related offenses in connection with this incident.

Appellant was tried before a jury. At trial, the Commonwealth introduced the testimony of a number of witnesses, including that of several police officers, the deputy medical examiner, two eyewitnesses, and Sokolove's widow. Those witnesses established that Sokolove was shot in the head and neck as he sat in his taxi in the 4300 block of Wayne Avenue in Philadelphia. Witnesses saw three men exit the cab and run from the area. One witness identified Appellant at trial as resembling one of the men he saw running from the scene.

Sokolove died five days after the shooting, and the wallet that he usually carried was never found. Police recovered no fingerprints and no gun.

The Commonwealth's main witness was David Wingfield, a longtime acquaintance of Appellant. Wingfield testified that, in March of 1984, he was at Appellant's home prior to going to a party with Appellant's brother. While Wingfield and Appellant were in Appellant's room, Appellant confessed that in 1983 he had been involved in the robbery and shooting of a cab driver on Wayne Avenue. According to Wingfield, Appellant said that he and two other men, Gregory Fulton and Matthew McNeil, the husband of Wingfield's sister, had robbed the cab driver and Appellant had shot the driver because he was "tussling." (N.T. 5/26/88, at 114.) Wingfield testified that he did not report his knowledge of the incident to law enforcement authorities until 1986[1] because he spent the intervening two years investigating his brother-in-law's role in the killing.

Appellant's only witness was the attorney who had represented him at the preliminary hearing. That witness testified that, prior to the preliminary hearing, Wingfield (who was the sole witness at the preliminary hearing) had told him that Appellant was not involved in the incident that resulted in the killing of the cab driver.

The jury found Appellant guilty of murder in the first degree, robbery, and conspiracy. Post-verdict motions were denied, and Appellant was sentenced to life imprisonment on the murder conviction, 60 to 120 months on the robbery conviction, and 60 to 120 months on the conspiracy conviction. On appeal, the Superior Court affirmed the judgment of sentence in an unpublished memorandum opinion. 421 Pa.Super. 629, 612 A.2d 530.

---

1. Wingfield testified inconsistently as to when in 1986 he first went to the authorities, stating both that it was in the beginning of 1986 (N.T. 5/26/88, at 117) and that it was in December of 1986 (*e.g.*, N.T. 5/26/88, at 121). The detective to whom Wingfield first gave a statement testified that the statement was dated March 31, 1986, and that Wingfield would have been mistaken if he said he first gave a statement in December 1986. (N.T. 5/27/88, at 43.)

■ This Court granted leave to appeal to consider whether trial counsel was ineffective for failing to investigate the background of, and therefore failing to properly impeach the credibility of, the Commonwealth's primary witness, David Wingfield. Appellant contends that an investigation would have revealed that Wingfield was incarcerated at the time Appellant allegedly confessed to him and that Wingfield had a record of *crimen falsi* convictions, including robbery, burglary, two counts of theft, unlawful taking, and three counts of theft, receiving stolen property.[2]

At hearings on post-verdict motions, trial counsel testified to her failure to investigate. Trial counsel testified that she did suspect that Wingfield had a criminal record but did not conduct an independent investigation of his background. Instead, she requested that the Commonwealth provide her with discovery of information relevant to the veracity of Commonwealth witnesses, including information on arrests or convictions and information regarding any probationary, parole, or custodial status. Although trial counsel did receive some written discovery from the Commonwealth, information on Wingfield's criminal record was given to her orally by the Assistant District Attorney. Counsel did not remember the specifics of what the Assistant District Attorney told her, and she did not recall asking Wingfield about his criminal record. Counsel testified that she did review the notes of testimony from the preliminary hearing before trial. (N.T. 5/30/89, at 3–14, 17, 34–35, and Exh. D–1.)

Albert Wright, a parole agent with the Pennsylvania Board of Probation and Parole, also testified at a hearing on post-verdict motions. Wright testified that, according to the parole records, David Wingfield was incarcerated during the entire year of 1984. (N.T. 11/14/89, at 4.) He was not released to the community until March 16, 1985. (*Id.*)

2. Appellant also argues that post-trial counsel was ineffective for failing to preserve these issues. Because the substantive issues were resurrected by appellate counsel and addressed on their merits by the Superior Court, we deem the preservation issue to be moot; thus, it will not be addressed.

■ A criminal defendant raising a claim of ineffectiveness of counsel must establish that the underlying claim is of arguable merit, that counsel had no reasonable basis for failing to pursue the claim, and that the defendant was prejudiced by counsel's failure. *See generally, e.g., Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987).

■ Applying this test, we find that Appellant has established a claim of ineffectiveness with regard to trial counsel's failure to investigate and introduce evidence concerning Wingfield's incarceration. First, we do not doubt that Appellant's claim has arguable merit. Wingfield was the Commonwealth's primary witness, and his testimony that Appellant had confessed to the crimes charged was devastating to the defense. Further, as will be discussed more fully below, Wingfield was the only witness to provide a solid link between Appellant and the crimes charged. Thus, casting doubt on Wingfield's credibility was essential to Appellant's defense. *Compare, e.g., Commonwealth v. Murphy,* 527 Pa. 309, 591 A.2d 278 (1991); *Commonwealth v. Bolden,* 517 Pa. 10, 534 A.2d 456 (1987); *Commonwealth v. Abney,* 465 Pa. 304, 350 A.2d 407 (1976).

Had the information regarding Wingfield's incarceration been revealed, it would have severely undermined his credibility by rendering his version of the facts a virtual impossibility. The Commonwealth argues, and the Superior Court agreed, that this claim has no merit because Wingfield apparently was simply mistaken as to the date of the conversation, and the conversation probably took place in March of 1985, after Wingfield was in fact released from prison. However, the record does not support this conjecture. Wingfield repeatedly and consistently affirmed that the conversation took place in March of 1984. (*See, e.g.,* N.T. 5/26/88, at 113, 115, 118, 120, 124, 129; N.T. 5/27/88, at 14.) Wingfield also stated that he had discussed the incident with his brother-in-law "on the street" in March of 1984. (N.T. 5/26/88, at 123.) Further, that date fits into the timetable to which Wingfield testified concerning how much time he spent investigating the matter before reporting it to the authorities.

■ Second, we can discern no reasonable basis for counsel's failure to pursue this line of inquiry, given the importance of Wingfield's testimony and the impeachment value of the evidence of his incarceration. Review of the notes of testimony from the preliminary hearing would have alerted trial counsel to the possibility that Wingfield was incarcerated at the time he claimed to have spoken with Appellant at Appellant's home. At that hearing, as he did subsequently at trial, Wingfield testified that Appellant confessed his role in the crimes while Wingfield was at Appellant's house in March of 1984. On cross-examination, defense counsel questioned Wingfield about the time periods during which he was incarcerated. He then asked:

Q. I want to know if you were incarcerated how would ...
What did they do, let you out to have a conversation at my client's house?

(N.T. 4/22/87, at 36.) The Commonwealth's objection to this question was sustained, although no basis was stated for the objection, and no further testimony was taken.[3]

■ The Superior Court found that counsel would have had a reasonable basis for forgoing this issue because attacking Wingfield's credibility in this way would have opened the door for the Commonwealth to rehabilitate the witness by introducing evidence that he had a second source of information concerning Appellant's role in the crime. We do not agree with the Superior Court's assessment, for testimony that a

---

3. In this case, counsel was, or should have been, made aware of the issue. However, even if the matter had not been brought to her attention directly, counsel had a duty to investigate and should not have relied solely on the information provided to her by the Commonwealth. This Court has stated that

"[t]he Constitution does not contemplate that prisoners shall be dependent upon government agents for legal counsel and aid, however[] conscientious and able those agents may be. Undivided allegiance and faithful, devoted service to a client are prized traditions of the American lawyer. It is this kind of service for which the Sixth Amendment makes provision." *Von Moltke v. Gillis,* [332 U.S. 708, 725, 68 S.Ct. 316, 324, 92 L.Ed. 309 (1948).] Further, the prosecution's file is not a substitute for an independent investigation by defense counsel.

*Commonwealth v. Mabie,* 467 Pa. 464, 474, 359 A.2d 369, 374 (1976).

second source told Wingfield that Appellant was involved in the killing would have been inadmissible hearsay. The Commonwealth argues that the testimony would not have been hearsay because it would have been offered not for the truth of the matter asserted, but to show that Wingfield heard the same story from someone other than Appellant. However, we fail to see how that fact could rehabilitate Wingfield's credibility regarding whether he had the alleged conversation with Appellant unless it were offered for the truth of what the source allegedly said.

 Finally, we find that Appellant was prejudiced by counsel's oversight. Wingfield was the only witness who directly linked Appellant to the crimes charged. The majority of the Commonwealth's witnesses established only that the crimes had occurred, and not the identity of any perpetrator. The police found no gun, fingerprints, or other evidence connecting Appellant to the crime. The Commonwealth argues that Appellant was not prejudiced because one witness who was present at the crime scene did identify Appellant at trial as one of the three men he saw running from the car. However, a review of the record reveals that this witness's identification was dubious at best.[4] Further, testimony that

**4.** That witness, William Miller, was driving by the scene as the cab driver was shot and saw the three men run from the cab. When first asked whether he saw any of the men in court, Miller failed to identify Appellant. (N.T. 5/26/88, at 57.) When asked a second time, he stated that Appellant "[did] favor" one of the men he had seen running from the cab, but that he did not identify him at first because Appellant had his hand in front of his face. (*Id.*) When asked again, Miller stated that he "would most likely be positive" that Appellant was one of the men. (*Id.* at 58.) On cross-examination, Miller testified that his memory of the incident was better in 1983 than at trial, but admitted that in 1983 he told the police that he was unable to see any of the men's faces. (*Id.* at 62–67.) On redirect examination, Miller stated that he recognized Appellant after seeing him in the hall, wearing handcuffs, being brought into the courtroom. (*Id.* at 72–73.)

The only other testimony specific to Appellant's involvement provided an even more tenuous basis for conviction: Philadelphia Police Officer John Wright testified that, on June 4, 1983, he saw Appellant, in the company of Gregory Fulton and Matthew McNeil (the other two men implicated in the killing), near the part of Wayne Avenue where the shooting took place. He also testified that Appellant's house was near this area. On cross-examination, Officer Wright testified that Appellant

Appellant was seen running from the car, without more, would not establish the elements of the crimes with which he was charged, particularly the elements of intent required to support his convictions of first degree murder and criminal conspiracy. It was Appellant's alleged confession that supplied those elements.

The Commonwealth also argues that Appellant was not prejudiced by counsel's failure because counsel did impeach Wingfield's credibility by showing that he had given three inconsistent statements to the police, by exploring his possible motive for testifying falsely in return for favorable treatment from the prosecution on assault charges that were pending against him, and by eliciting testimony that revealed that he was a convicted felon. We do not agree that evidence of Wingfield's incarceration during the crucial time would have been cumulative of this questioning. The omitted evidence would not have been "merely a general assault on the veracity of the witness," but would have directly contradicted his version of the facts. *Cf. Commonwealth v. Smith,* 502 Pa. 600, 609–10, 467 A.2d 1120, 1125 (1983).[5]

Accordingly, we reverse the decision of the Superior Court and remand for a new trial on all charges.

MONTEMURO, S.J., did not participate in the consideration or decision of this case.*

was with six to eight other men in addition to Fulton and McNeil. (N.T. 5/27/88, at 55–61.)

5. Given our disposition of this issue, we need not reach the issue of whether counsel was also ineffective in failing to impeach Wingfield with his *crimen falsi* convictions.

* Mr. Justice Montemuro is sitting by designation as Senior Justice pursuant to Judicial Assignment Docket No. 94 R1800, due to the unavailability of Mr. Justice Larsen, see No. 127 Judicial Administration Docket No. 1, filed October 28, 1993.