724 A.2d 326

**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Daniel KIMBALL, Appellee.**

Supreme Court of Pennsylvania.

Submitted Oct. 23, 1997.

Decided Jan. 22, 1999.

Reargument Denied March 10, 1999.

300

Anthony J. Rosini, Sunbury, John P. Muncer, Asst. Dist. Atty., for the Com.

Bruce A. Antkowiak, Greensburg, for Daniel Kimball.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION OF THE COURT

NEWMAN, Justice.

The Commonwealth of Pennsylvania appeals from the Superior Court's Opinion and Order finding the trial counsel of Daniel Kimball (Kimball) ineffective. In reviewing the Superior Court's decision, we are called on to reexamine the plurality opinion in *Commonweatlh v. Buehl*, 540 Pa. 493, 658 A.2d 771 (1995). For the following reasons, we decline to follow the plurality opinion in *Buehl*, but nevertheless reverse the Order of the Superior Court.

## FACTUAL AND PROCEDURAL BACKGROUND

In July of 1988, the police found Rosemary Kleinsmith (the Victim) dead in her apartment. Kimball was arrested and charged with her murder. In statements to police, Kimball admitted that he had caused the Victim's death, but denied that he had intended to kill her. Thus, at trial, the central issue was not the identity of the murderer but his degree of guilt. Elizabeth Beroes, Esquire (trial/defense counsel) of the Northumberland County Office of Special and Conflicts Counsel represented Kimball at trial.

·The evidence showed that Kimball had been drinking heavily on the day of the crime. At midnight, he met the Victim, with whom he was friendly. They drank together in a bar until after 1:00 a.m., and then went to the Victim's apartment. Within twenty to thirty minutes, they began fighting. Kimball stated that he struck the Victim karate-style across the throat, which caused her to fall into a wall, resulting in her death.

In contrast, the Commonwealth's forensic pathologist opined that the Victim had died of manual strangulation. The Com-

monwealth also presented the testimony of Kimball's cell mate, James Adam Shortridge (Shortridge). According to Shortridge, Kimball admitted to killing the Victim by manual strangulation and wrapping a telephone wire around her neck to be certain she was dead. In exchange for his testimony, the Commonwealth promised Shortridge that he could serve his pending prison sentence in a county, instead of a state, facility. Although defense counsel was aware of the agreement the prosecution had with Shortridge, she did not cross-examine him concerning the deal he made with the Commonwealth. However, defense counsel did elicit from Shortridge that he had been convicted of several felonies, that Kimball told him that the Victim kicked him in the groin when they started arguing, and that Kimball had not planned to kill her.

To negate the element of specific intent to kill, trial counsel attempted to present an expert in support of a diminished capacity defense, but the trial court disallowed the expert's testimony. Nonetheless, defense counsel presented the testimony of Kimball's adoptive father, Reverend John Kimball (Reverend Kimball), who stated that Kimball manifested behavioral problems since his infancy, had problems in school and the Navy, has a drinking problem, and has a history of violent and angry behavior.

The jury convicted Kimball of first degree murder. The court sentenced him to life imprisonment. On direct appeal, the Superior Court affirmed the judgment of sentence, and this Court denied Kimball's Petition for Allowance of Appeal.

Kimball then filed a Petition for Relief pursuant to the Post Conviction Relief Act (PCRA) [1], asserting, *inter alia*, that defense counsel's failure to cross-examine Shortridge, a key Commonwealth witness, concerning his deal with the prosecution and counsel's presentation of the damaging testimony of Reverend Kimball constituted ineffective assistance of counsel. The Court of Common Pleas of Northumberland County (PCRA court) held an evidentiary hearing at which Kimball testified on his own behalf and presented the testimony of his

1. 42 Pa.C.S. §9541 *et seq.*

trial counsel. After the conclusion of the hearing, the PCRA court denied Kimball relief, reasoning that "[i]t was clear from the overwhelming evidence that there was really no viable defense this Defendant could raise." PCRA Ct. Op., at 6.

On appeal, a sharply divided Superior Court reversed, vacated and remanded for a new trial.[2] At the outset, the Superior Court majority held that there is no substantive difference between the prejudice standard for ineffective assistance of counsel under the PCRA and that applicable on direct appeal. Accordingly, the court agreed with the concurring and dissenting opinions in *Buehl* that the language of Section 9543(a)(2)(ii)[3] of the PCRA does not vary the standard set

**2.** Initially, a panel of the Superior Court reversed and remanded for a new trial, holding that counsel was ineffective for failing to cross-examine Shortridge concerning bias and for presenting the testimony of Reverend Kimball. Pursuant to the Commonwealth's application for reargument, the court then re-heard argument en banc.

**3.** Section 9543 of the PCRA provides:

§ 9543. Eligibility for relief

**(a) General rule.**—To be eligible for relief under this subchapter, *the petitioner must plead and prove by a preponderance of the evidence all of the following*:

(1) That the petitioner has been convicted of a crime under the laws of this Commonwealth and is:

(i) currently serving a sentence of imprisonment, probation or parole for the crime;

(ii) awaiting execution of a sentence of death for the crime; or

(iii) serving a sentence which must expire before the person may commence serving the disputed sentence.

(2) That the conviction or sentence resulted from one or more of the following:

(i) A violation of the Constitution of this Commonwealth or the Constitution or laws of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

(ii) *Ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.*

(iii) A plea of guilty unlawfully induced where the circumstances make it likely that the inducement caused the petitioner to plead guilty and the petitioner is innocent.

(iv) The improper obstruction by government officials of the petitioner's right of appeal where a meritorious appealable issue existed and was properly preserved in the trial court.

(v) Deleted.

forth in *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987), relating to ineffectiveness claims on direct appeal. Judge Tamilia agreed with the majority that there is no substantive distinction between the prejudice standard applicable on direct appeal and that of the PCRA, but dissented from the majority's holding that counsel was ineffective. Judge McEwen concurred in the result. Both Judge Hudock and Judge Popovich dissented on the basis that the PCRA renders more stringent the prejudice requirement, but disagreed about whether Kimball met that standard. In contrast to Judge Hudock, Judge Popovich concluded that Kimball failed to establish trial counsel's ineffectiveness.

In *Buehl*, Justice Montemuro, writing for a plurality of this Court, interpreted Section 9543(a)(2)(ii) as establishing a more stringent prejudice requirement for ineffectiveness claims raised on collateral attack than on direct appeal. According to the *Buehl* plurality, pursuant to the PCRA, it is insufficient for a petitioner to show that there was a reasonable probability that, but for counsel's error, the outcome of the proceedings may have been different. Instead, in a collateral appeal, the petitioner must prove by a preponderance of the evidence that his conviction or sentence resulted from "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth determining process that no reliable adjudication of guilt or innocence could have taken place." *Buehl*, 540 Pa. at 503, 658 A.2d at 776 (citing 42 Pa.C.S. §9543(a)(2)(ii)).[4]

> (vi) The unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced.
> (vii) The imposition of a sentence greater than the lawful maximum.
> (viii) A proceeding in a tribunal without jurisdiction.
> (3) That the allegation of error has not been previously litigated or waived.
> (4) That the failure to litigate the issue prior to or during trial, during unitary review or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel.
> 42 Pa.C.S. §9543 (emphasis added).

4. Specifically, in *Buehl*, a capital case, the petitioner raised several claims in his post-conviction petition for relief, including trial counsel's

Thus, in *Buehl*, the plurality opinion applied Section 9543(a)(2)(ii) to deny relief to an ineffectiveness claim that may have affected the outcome of the trial, but did not more likely than not render the verdict unreliable. Specifically, trial counsel in *Buehl* erred in failing to request a cautionary instruction regarding the prosecution's introduction of evidence of other crimes. Although the outcome of the *Buehl* trial may have been different had counsel requested a cautionary instruction, the *Buehl* plurality was unable to conclude that, due to the overwhelming evidence of the defendant's guilt, counsel's omission resulted in an unreliable verdict.

In concurring and dissenting opinions, former Chief Justice Nix, Justice Flaherty, now Chief Justice Flaherty, and Justice Cappy asserted that Section 9543(a)(2)(ii) does not create a more stringent standard than the *Pierce* standard applicable to direct appeals.[5]

ineffectiveness for failing to request a cautionary instruction after the prosecution introduced evidence concerning his involvement in robberies that occurred prior to the murders in question. We affirmed the denial of post-conviction relief and reinstated the judgment of sentence of death. *Commonwealth v. Buehl*, 540 Pa. 493, 658 A.2d 771 (1995).

Buehl subsequently petitioned the United States District Court for the Eastern District of Pennsylvania for a Writ of Habeas Corpus. The court affirmed Buehl's convictions for first degree murder, but vacated the judgment of sentence of death due to ineffective assistance of counsel. *Buehl v. Vaughn*, No. 95–5917, 1996 WL 752959, 1996 U.S. Dist. LEXIS 19509 (E.D.Pa. December 31, 1996). The District Court noted that the *Buehl* plurality opinion did not represent a majority of this Court concerning the prejudice standard of ineffectiveness claims on collateral attack. Thus, the court applied federal law without trying to "sort out" the conclusions of this Court in *Buehl*. *Id*. 1996 WL 752959 at *43. Nonetheless, in assessing Buehl's claims of ineffectiveness relating to the guilt phase of the trial, the court declared, "[n]ot every constitutional error by counsel renders his assistance ineffective." *Id*. 1996 WL 752959 at *17–18. The court then held that there is no reasonable probability that the outcome would have been different had counsel requested a limiting instruction concerning the other crimes evidence due to the overwhelming independent evidence of Buehl's guilt. Subsequently, the District Court denied Buehl's Motion for Reconsideration and granted his motion for a Certificate of Appealability. *Buehl v. Vaughn*, No. 95–5917, 1997 WL 118084, 1997 U.S. Dist. LEXIS 2470 (E.D.Pa. March 5, 1997).

5. Chief Justice Nix disagreed with the Opinion Announcing the Judgment of the Court that the PCRA imposes a heightened prejudice

We granted allowance of appeal to determine a petitioner's burden of proof in an ineffectiveness claim raised pursuant to the PCRA and, according to that standard, whether Kimball established his counsel's ineffectiveness. We hold that the PCRA does not impose a more stringent prejudice requirement than that applicable to direct appeals, and we decline to follow the plurality opinion in *Buehl.* While we hold that the PCRA does not create a more stringent standard for prevailing on an ineffectiveness claim, we nevertheless hold that Kimball failed to demonstrate that his trial counsel was ineffective for failing to cross-examine Shortridge concerning bias or for presenting the testimony of Reverend Kimball.

## DISCUSSION

### Ineffectiveness Under the PCRA

In order to understand the evolution of the standard for ineffective assistance of counsel, it is necessary to reexamine this Court's decision in *Pierce* and the effect that *Pierce* had on the then-existing standard for evaluating ineffective assistance of counsel claims. This Court in *Pierce* was presented with the question of whether Pennsylvania's standard for ineffective assistance of counsel claims, as set forth in *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967), included the prejudice standard described by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The majority in *Pierce* cited the following language from *Strickland:*

> Convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that

standard, but concurred that Buehl had not established his counsel's ineffectiveness pursuant to the *Pierce* standard. Justice Cappy, joined by then Justice, now Chief Justice Flaherty, dissented on the basis that the PCRA imposes no greater burden on a defendant than the *Pierce* /Strickland test, and that Buehl had established his counsel's ineffectiveness for failing to request a cautionary instruction regarding evidence of other crimes.

counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable.

*Pierce,* 515 Pa. at 157–58, 527 A.2d at 975 (citing *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052). The *Pierce* court concluded that Pennsylvania had always required a demonstration of prejudice in order to succeed on an ineffectiveness claim, and that the *Strickland* test was consonant with Pennsylvania's prejudice standard in *Maroney:*

The obvious identical textual and policy considerations in *Maroney* and *Strickland* logically lead us to hold that together they constitute the same rule. Our decisions in *Maroney* and its progeny, therefore, do not create greater or lesser protection under Article I, Section 9 of the Pennsylvania Constitution, than the present federal standard. For these reasons, we insist that our cases require that a defendant must show that the omission or commission by counsel was arguably ineffective and the likelihood that he was prejudiced as a result thereby.

*Pierce,* 515 Pa. at 161, 527 A.2d at 976. Based on this language, subsequent decisions interpreting the prejudice prong of *Pierce* have held that a successful ineffective assistance of counsel claim requires a showing by the defendant that, "but for counsel's act or omission, the outcome of the proceedings would have been different." *Commonwealth v. Appel,* 547 Pa. 171, 199–200, 689 A.2d 891, 905 (1997) (citing *Commonwealth v. Douglas,* 537 Pa. 588, 645 A.2d 226 (1994)).

The development of the *Pierce/Strickland* standard in *Pierce*'s progeny, however, has avoided language from *Strickland* that emphasized that the overriding Sixth Amendment concern with ineffective assistance of counsel is on the "funda-

mental fairness" of the defendant's trial. The *Strickland* court stated:

> the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

*Strickland,* 466 U.S. at 696, 104 S.Ct. 2052. Thus, although *Strickland* recognizes that the central concern is on the "reliability" of the proceedings, and the effect of counsel's ineffectiveness thereon, Pennsylvania decisions subsequent to *Pierce* have instead focused on the definition of "prejudice" contained in *Strickland,* that there be a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. *See Appel, supra,* and *Douglas, supra.*

The United States Supreme Court, however, has emphasized that attention to the reliability of the trial's results, and the fairness thereof, is essential to evaluating any ineffective assistance of counsel claim. As the Court stated in *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993):

> The test formulated in *Strickland* for determining whether counsel has rendered constitutionally ineffective assistance reflects this concern. In *Strickland,* we identified the two components to any ineffective-assistance claim: (1) deficient performance and (2) prejudice. Under our decisions, a criminal defendant alleging prejudice must show 'that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' ... Thus, an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant

the defendant a windfall to which the law does not entitle him.

*Id.* at 369–70, 113 S.Ct. 838 (footnote omitted) (citations omitted). Although the dissent in *Lockhart* criticized the majority for not following the *Strickland* standard, *see Lockhart*, 506 U.S. at 380, 113 S.Ct. 838 (Stevens, J., dissenting), the majority in *Lockhart* clearly indicated that it was not deviating from the *Strickland* standard in emphasizing that fairness and reliability of the result of the proceeding constituted part of the prejudice prong of *Strickland. Id.*, 506 U.S. at 370–71, n. 2, n. 3, 113 S.Ct. 538.

▆ We thus see in *Strickland* and *Lockhart* a tension between two principles created by the language in *Strickland* itself. On the one hand, the United States Supreme Court gives a clear standard for determining when counsel's ineffectiveness denies a defendant his or her Sixth Amendment right to counsel, namely, where there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. "Reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." *Id.* This prejudice standard from *Strickland* has gained wide acceptance in many jurisdictions,[6] and represents the test currently employed in Pennsylvania for ineffective assistance of counsel claims on direct appeal. *See Appel, supra, Douglas, supra.*

Yet at the same time that the *Strickland* Court established this test, it rejected as "not quite appropriate" a prejudice test based on a defendant's proving that "counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at 693–94, 104 S.Ct. 2052. Moreover, the majority in *Strickland* also emphasized that the "ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.* at 696, 104 S.Ct. 2052. It is this reference to "fairness" in the proceed-

6. *See, e.g., In re Wilson*, 3 Cal.4th 945, 13 Cal.Rptr.2d 269, 838 P.2d 1222 (Cal.1992); *State v. Jack*, 144 N.J. 240, 676 A.2d 545 (1996); *Hernandez v. State*, 726 S.W.2d 53 (Tex.Crim.App.1986).

ings, and the later reference in *Strickland* to the reliability of the result, that *Lockhart* stresses when it states that "a criminal defendant alleging prejudice must show 'that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Lockhart*, 506 U.S. at 369, 113 S.Ct. 838 (citing *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052).

When presented with the question of whether the standard for evaluating a claim of ineffective assistance of counsel under the PCRA is more stringent than the *Pierce* standard for ineffectiveness on direct appeal, we must determine whether the difference in language represents a difference in meaning. In other words, does the phrase "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place" create a greater burden to prevail on a claim of ineffective assistance of counsel than we articulated in *Pierce* when we stated that Pennsylvania's standard and *Strickland* "constitute the identical rule of law" in this Commonwealth? *Pierce*, 515 Pa. at 161, 527 A.2d at 977.

■ We find that the language of the PCRA does not create a higher burden on a defendant to show ineffective assistance of counsel than the standard for proving ineffectiveness on direct appeal. Both the PCRA language and *Pierce* reflect two aspects of the same standard: *Strickland*'s test for determining when counsel's ineffectiveness prejudiced the defendant. *Pierce* and its progeny adopted the "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" definition of prejudice and largely ignored other language in *Strickland* concerning the scope of the ineffectiveness inquiry as a determination of fundamental fairness and the reliability of the results of the proceeding. The PCRA definition, however, mirrors the reliability-of-the-result facet of *Strickland*, which *Pierce* and its progeny have de-emphasized in favor of the more easily apprehended "prejudice" test. *Strickland*'s admonition that "[i]n every case the court should be concerned with whether...the result of the particular proceeding is unreliable because of a breakdown in the adversarial process,"

*Strickland,* 466 U.S. at 696, 104 S.Ct. 2052, finds its echo in the following language from the PCRA:

(2) [t]hat the conviction or sentence resulted from one or more of the following:

. . .

(ii) ineffective assistance of counsel which, in the circumstances of the particular case, *so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.*

42 Pa.C.S. §9543 (emphasis added).

We must conclude that the PCRA standard is equivalent to the standard for direct appeal claims of ineffective assistance of counsel, because to hold otherwise would require us to recognize that the ineffective assistance of counsel test adopted in *Pierce* is actually *less* stringent than the *Strickland* standard. This we refuse to do, and should not do, given *Pierce*'s express recognition that our standard for ineffective assistance of counsel claims on direct appeal is "identical" to *Strickland*'s. If the PCRA standard for evaluating ineffective assistance of counsel comports with *Strickland,* as it must, and our *Pierce* standard is "identical" to *Strickland,* then we cannot hold that the one places a greater burden on a defendant than the other.

The reasonableness of applying the same standard for ineffective assistance of counsel claims on direct appeal as in PCRA proceedings is also apparent from an examination of how a defendant typically would raise ineffectiveness claims. A defendant will only raise a claim of his or her trial counsel's ineffectiveness on direct appeal if he or she obtains new counsel on appeal, since it is "unrealistic to expect trial counsel on direct appeal to raise his own ineffectiveness." *Commonwealth v. Dancer,* 460 Pa. 95, 100, 331 A.2d 435, 438 (1975). New counsel, through the filing of post-sentencing motions, will be able to create a record before the trial court to provide for meaningful appellate review of his or her client's claims of trial counsel's ineffectiveness.[7] However, the defendant whose

7. Indeed, we note that this need for a record for appellate review of ineffectiveness claims prompted the Third Circuit Court of Appeals to

trial counsel represents him or her on appeal would not raise the ineffective assistance of counsel claim, nor develop a record in support of that claim. That defendant is left with no avenue to present an ineffectiveness claim except through a PCRA proceeding. Were we to recognize a more stringent PCRA standard, we would reward a defendant whose counsel is skilled enough to recognize a substantial question of his or her own ineffectiveness and who recommends new counsel on appeal so that his or her client may benefit from the more lenient standard, and we would penalize a defendant whose counsel does not identify a substantial question of his own ineffectiveness at trial, thus subjecting his or her client to a heavier burden to prove that ineffectiveness in the PCRA proceeding.

By holding that the PCRA standard does not impose a more onerous burden on a defendant than that required by *Pierce,* we do not rewrite the PCRA nor alter the test for proving ineffective assistance of counsel in a PCRA petition. The petitioner must still show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. This requires the petitioner to show: (1) that the claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and, (3) that, but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. What we hold today is that, where the petitioner has demonstrated that counsel's ineffectiveness has created a reasonable probability that the outcome of the proceedings would have been different, then no *reliable* adjudication of guilt or innocence could

adopt a policy that it will not ordinarily entertain claims of ineffective assistance of counsel on direct appeal, and these claims must be raised in federal collateral proceedings. *See United States v. Headley,* 923 F.2d 1079 (3d Cir.1991). The narrow exception to this policy is when the record is sufficient to permit effective appellate review and make further evidentiary proceedings unnecessary. *See Government of Virgin Islands v. Zepp,* 748 F.2d 125 (3d Cir.1984).

have taken place. Reliability of the adjudication of guilt or innocence and the probability that counsel's ineffectiveness caused a different outcome of the proceedings are concepts so closely intertwined and commonly-rooted in *Strickland* that we refuse to separate them.

Having held that the PCRA does not create a heightened standard for claims of ineffective assistance of counsel than the standard employed for those claims on direct appeal, we turn to Kimball's claims.

### Cross–Examination of Shortridge

Kimball alleges that trial counsel was ineffective for failing to cross-examine his cell mate, Shortridge, concerning his potential pro-prosecution bias. The Superior Court agreed, relying on *Commonwealth v. Evans*, 511 Pa. 214, 512 A.2d 626 (1986).

*Evans* did not involve ineffective assistance of counsel, but trial court error. In *Evans*, a murder trial, the principal prosecution witness was charged for his participation in the murder at issue as well as other unrelated crimes in the county. The trial court allowed the defense to cross-examine him about whether he was promised leniency with respect to the crimes at issue, but disallowed questions concerning any promise of lenient treatment for the other pending charges. On appeal, we held that the trial court erred in disallowing the defense the opportunity to cross-examine the witness concerning the other charges. In ruling that the trial court committed reversible error, we stated that the jury must be informed of possible bias in order to assess accurately the witness' credibility. We explained that even if the prosecution made no promises to the witness, either in the pending case or any other criminal matter pending in the jurisdiction, the witness may hope for favorable treatment by testifying favorably for the prosecution.[8]

8. In *Evans*, the Commonwealth based its case almost completely on the testimony of the witness in question. His testimony was the only evidence linking the defendants to the crime scene. Therefore, the trial court's error in restricting cross-examination of the witness for bias was

314

■ Assuming that disclosure of the Commonwealth's promise would have undermined Shortridge's credibility, we agree with the Superior Court that *Evans* establishes the arguable merit of Kimball's contention that counsel erred in failing to impeach Shortridge on this basis. For this omission, trial counsel offered no reasonable explanation. Although counsel's arguably serious error is unexplained, this does not end our ineffectiveness inquiry. Turning to the element of prejudice, we cannot conclude that counsel's omission rendered the verdict unreliable because Shortridge's testimony was not critical to the prosecution's case; trial counsel did elicit certain favorable testimony from him; and counsel impeached his credibility on other grounds.

This case is distinguishable from *Commonwealth v. Murphy*, 527 Pa. 309, 591 A.2d 278 (1991), and *Commonwealth v. Baxter*, 537 Pa. 41, 640 A.2d 1271 (1994), both direct appeals involving ineffectiveness claims relating to the cross-examination of key prosecution witnesses. In *Murphy*, we found defense counsel ineffective for attempting to impeach a crucial Commonwealth witness on impermissible grounds, but failing to cross-examine her as to her juvenile probationary status. There, we found counsel's error prejudicial because the witness was the only eyewitness to the crime, and consequently, her credibility was critical to the prosecution's case. In *Baxter*, we found counsel ineffective for failing to investigate the background of the primary prosecution witness, and therefore, failing properly to impeach his credibility. The witness in *Baxter* testified that, in the course of a conversation he had with the defendant at his home, the defendant confessed to the murder in question. At the time of the alleged confession, however, the witness was actually incarcerated. We found the

not harmless beyond a reasonable doubt. In contrast, in *Commonwealth v. Culmer*, 413 Pa.Super. 203, 604 A.2d 1090 (1992), also cited by the Superior Court, the court found that the trial court's error in restricting the cross-examination of a prosecution witness for bias was harmless because, in that case, the inference of bias was tenuous and farfetched. There, at the time of trial, the victim had unrelated criminal charges pending against him. He had, however, identified the defendant as his assailant at the time of the crime and merely continued to maintain this position at trial.

omission prejudicial because the witness presented the only solid evidence linking the defendant to the crime, yet his incarceration would have rendered his version of the events impossible.

Here, however, there was no question that Kimball killed the Victim; the only question was Kimball's degree of guilt. Although Shortridge testified at trial that Kimball confided to him that he manually strangled the Victim and wrapped a telephone cord around her neck, Notes of Testimony, November 28, 1989, at 138, his testimony was not critical to the prosecution's case. The Commonwealth presented substantial independent evidence of manual strangulation. Specifically, the Commonwealth presented the testimony of Isidore Mihalakis, M.D., a forensic pathologist, who performed the autopsy of the Victim. Dr. Mihalakis concluded that the victim died of manual strangulation. N.T. 11/28/89 at 237, 244. The doctor also gave four reasons why the victim did not die of a karate chop to the throat: (1) the Victim's throat was not swollen from a blow; (2) her heart activity was not affected by the compression of any vital nerves; (3) the center of the Victim's Adam's apple was not fractured; and (4) the Victim's hyoid bone was fractured, which is unlikely to occur from anything other than strangulation. N.T. 11/28/89 at 237–39. Also, Kimball's expert, Cyril Wecht, M.D., acknowledged on cross-examination that the Victim's neck injuries, particularly the bone fractures, are more consistent with manual strangulation than blows to the neck. N.T. 11/28/89 at 574. Dr. Wecht also stated that her neck injuries could not have been produced by a single karate chop, as alleged by Kimball. N.T. 11/28/89 at 578. Further, the Victim's upstairs neighbor, John Edward Strausser, testified that, on the night of the murder, he awoke at about 1:45 a.m. when he heard the Victim screaming, "Help me" and either, "he is choking me" or "they're choking me." N.T. 11/28/89 at 98–99.

Additionally, trial counsel elicited from Shortridge on cross-examination that Kimball claimed the Victim initiated physical contact in the course of their argument. N.T. 11/28/89 at 151, 154. Further, counsel elicited from Shor-

tridge that Kimball did not plan to kill the Victim. N.T. 11/28/89 at 164–65. This testimony is not inconsistent with Kimball's version of the incident. Moreover, trial counsel did cross-examine Shortridge concerning his prior felony criminal record involving burglary and robbery charges. N.T. 11/28/89 at 149. *See Commonwealth v. Perdue*, 387 Pa.Super. 473, 487 n. 6, 564 A.2d 489, 496 n. 6 (1989), *allocatur denied*, 524 Pa. 627, 574 A.2d 68 (1990)(counsel's failure to elicit possible bias in favor of prosecution due to outstanding criminal charges did not undermine reliability of verdict where counsel impeached witness on other grounds). Accordingly, due to the overwhelming evidence against Kimball and his counsel's otherwise adequate cross-examination of Shortridge, we conclude that counsel's error does not entitle Kimball to relief.

### *Testimony of Reverend Kimball*

Kimball next argues that trial counsel was ineffective for presenting the damaging testimony of his adoptive father, Reverend Kimball. Although it appears in retrospect that Reverend Kimball's testimony was not helpful, we cannot conclude that trial counsel's strategy in presenting this testimony was unreasonable or so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

Kimball's allegation is similar to that at issue in *Commonwealth v. Savage*, 529 Pa. 108, 602 A.2d 309 (1992). In *Savage*, a murder prosecution, defense counsel disclosed, in his opening statement, the defendant's prior criminal record involving convictions for attempted burglary and drug and weapons offenses. Counsel's strategy was to demonstrate the defendant's willingness to be honest about his past. Following his conviction, the defendant appealed alleging ineffective assistance of counsel. We held that the introduction of the defendant's prior crimes to vouch for his credibility was not unreasonable, even if unsuccessful, under the circumstances.

Here, trial counsel explained that, in order to reduce Kimball's degree of guilt, she attempted to elicit sympathy for him

by showing him to be the product of his environment. Notes of Testimony, May 31, 1994, at 47–48. She thought the jury would see Reverend Kimball as "nothing more than a villain himself." N.T. 5/31/94 at 47.

Reverend Kimball, an Episcopal priest, testified that he and his first wife adopted Kimball when he was two months old and that he had manifested behavioral problems since his infancy. Notes of Testimony, November 28, 1989, at 393–94. He explained that his son had difficulties in school; he fought with other children and defied authority. N.T. 11/28/89 at 397. When Kimball was thirteen or fourteen years old, his parents divorced; Reverend Kimball retained custody of him. N.T. 11/28/89 at 394. Kimball's mother moved to Florida and ceased contact with the family. N.T. 11/28/89 at 395. After the divorce, Kimball experienced more serious problems in school. He was referred to special education classes, but the special schools rejected him. N.T. 11/28/89 at 398. He returned to public school, but the public school also rejected him. *Id.* When Kimball was fifteen or sixteen years old, Reverend Kimball signed a voluntary petition to have him adjudicated delinquent. N.T. 11/28/89 at 400. Kimball was sent to an institution for delinquent boys. N.T. 11/28/89 at 400–01. He ran away from the institution after several months. N.T. 11/28/89 at 401. He finally left Reverend Kimball's household at age seventeen. N.T. 11/28/89 at 404. By then, he had developed a drinking problem. *Id.* One of the last times that Reverend Kimball saw his son, he asked him to leave his home, and drove him at night to a train station in Norristown where he left him. N.T. 11/28/89 at 405. Eventually, when he was in the Navy, Kimball had a mental breakdown, for which he was hospitalized. N.T. 11/28/89 at 406. Shortly after the murder, Reverend Kimball told a detective that his son is manipulative, tends to bully others, and is prone to anger and violence. N.T. 11/28/89 at 415.

When asked why Reverend Kimball did not have the "father-child" relationship with Kimball that he had with his other children, he responded, "Including May [an adoptive daughter], we're friends, we're congenial. They do things that

please me. I cannot think of a time when Daniel did something that pleased me." N.T. 11/28/89 at 399. Concerning Kimball's adoption, Reverend Kimball provided the following testimony:

Q. Did you talk about the fact that Daniel was adopted?

A. I tried to.

Q. When did you tell him he was adopted?

A. I think at a conscious age of four or five.

Q. So, you told him at age four or five that he was adopted?

A. Yes.

Q. And, did you talk to him about that?

A. Not in any meaningful way.

Q. Was he inquisitive about it? Was he happy about it? Was he—as you saw, what was his reaction to that?

A. I can't say that he ever expressed any emotion or curiosity or—

Q. In what context would he bring up the fact that he was adopted in your discussions with him?

A. All I could say is, I think the mood was either angry, or at some moment when further discussions would have been impossible, like running from the car to the house in the driving rain; when it was just beyond any opportunity of development or discussion.

N.T. 11/28/89 at 402.

According to Reverend Kimball, his son would embarrass him when he tried to include him in family social occasions. N.T. 11/28/89 at 408. He recalled, in particular, his niece's wedding, at which Kimball got drunk. N.T. 11/28/89 at 409. According to Reverend Kimball, his son "climbed a tree, he sobbed and cried, and demanded the attention of Sarah, the bride, who had to take care of him." N.T. 11/28/89 at 409–10. After Kimball made this "scene," Reverend Kimball drove him to a bus station and left him there. N.T. 11/28/89 at 410. That was the last time Reverend Kimball saw his son. *Id.*

Based on this evidence, the court gave an involuntary manslaughter instruction to the jury.[9] While counsel may have chosen a wiser course than presenting Reverend Kimball's testimony to reduce Kimball's degree of guilt, the mere fact that counsel's chosen course of action was not successful does not render it unreasonable under the circumstances. *Savage, supra.*

Moreover, we cannot conclude that Reverend Kimball's testimony rendered the verdict unreliable. As Kimball notes in his brief to this Court, "[i]mportant to establishing the defendant's claim was his own credibility and the jury's consideration of his defense that the death of Ms. Kleinsmith had resulted from a sudden and violent fight he had had with her in which her death was not caused by any deliberate and intentional act on his part." Brief of Appellee, at 26. Reverend Kimball's testimony that Kimball had behavioral problems and was prone to react with anger and violence is not inconsistent with Kimball's defense. Accordingly, we cannot agree with Kimball that the admission of this testimony so prejudiced him as to render the verdict unreliable.

In conclusion, because Kimball failed to establish his counsel's ineffectiveness pursuant to the standard set forth in Section 9543(a)(2)(ii) of the PCRA, we reverse the Order of the Superior Court and reinstate the Opinion and Order of the PCRA court, denying Kimball relief.

Justice ZAPPALA and Justice CASTILLE file concurring opinions.

ZAPPALA, Justice, concurring:

I join in the majority opinion as I agree that the standard to evaluate counsel's effectiveness on direct appeal should equally apply to ineffective counsel claims under the Post Conviction

---

**9.** The Crimes Code provides:

A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person.

18 Pa.C.S. §2504.

Relief Act. Although I joined Justice Montemuro's opinion in *Commonwealth v. Buehl*, 540 Pa. 493, 658 A.2d 771 (1995), which held to the contrary, the protracted confusion in this area of the law convinces me that a separate standard for PCRA ineffectiveness claims is unworkable. Further, upon reflection, I am persuaded that the discrepancy in the language utilized in the PCRA and that espoused in *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987), amounts to a distinction without a difference. Accordingly, I conclude that the better approach is that taken by the majority opinion.

CASTILLE, Justice, concurring:

I agree with the majority that appellee failed to establish trial counsel's ineffectiveness pursuant to the standard set forth in Section 9543(a)(2)(ii) of the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541 *et seq.* However, I believe that the majority has misinterpreted the applicable standard for determining claims of ineffective assistance of counsel under Section 9543(a)(2)(ii). Therefore, I concur only in the result reached by the majority.

At the outset, it is important to note that there exists no constitutional entitlement to collateral appeal at the state level, and no constitutional entitlement to counsel if a state elects to furnish by statute the right to a collateral appeal. *Pennsylvania v. Finley*, 481 U.S. 551, 557, 107 S.Ct. 1990, 1994, 95 L.Ed.2d 539 (1987). Since there is no underlying Constitutional right to appointed counsel in state post-conviction proceedings, there also is no Constitutional right to insist on procedures which are designed solely to protect that underlying right, such as threshold requirements for the performance of counsel in state post-conviction proceedings. *Id.* As the United States Supreme Court succinctly concluded in *Finley*:

In Pennsylvania, the State has made a valid choice to give prisoners the assistance of counsel without requiring the full panoply of procedural protections that the Constitution requires be given to defendants who are in a fundamentally different position—at trial and on first appeal as of right.

In this context, the Constitution does not put the State to the difficult choice between affording no counsel whatsoever or following ... strict procedural guidelines....

*Id.* at 559, 107 S.Ct. at 1995.

Consequently, the concern voiced by Mr. Justice Cappy in *Commonwealth v. Buehl,* 540 Pa. 493, 658 A.2d 771 (1995), that a strict interpretation of the language at issue in the PCRA might result in a violation of the Sixth Amendment's guarantee of effective assistance of counsel, is inapposite, since there is no Sixth Amendment entitlement at all to counsel at the collateral appeal stage. Because no constitutional issues are implicated by this matter, this Court is confronted only with an issue of interpretation. Specifically, this Court must decide what standard the Legislature has created for reviewing claims of ineffective assistance of counsel under section 9543(a)(2)(ii) of the PCRA. As always, this Court's function in matters of statutory interpretation is, first, to attempt to discern the plain meaning of the language at issue. *Commonwealth v. Hagan,* 539 Pa. 609, 615, 654 A.2d 541, 544 (1995). The language of section 9543(a)(2)(ii) provides:

§ 9543. Eligibility for relief

(a) **General rule.**—To be eligible for relief under this subchapter, the petitioner must plead and prove by a preponderance of the evidence all of the following:

. . .

(2) That the conviction or sentence resulted from one or more of the following:

. . .

(ii) Ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

Thus, by the plain words of the statute at issue, the Legislature intended to confine relief to those instances in which the ineffective assistance of counsel undermined the reliability of the process by which truth is determined, such that the final adjudication of guilt or innocence is itself unreliable. Howev-

er, the majority concludes that relief is warranted in any instance in which a "reasonable probability" exists that the *outcome* of the proceedings would have been different but for counsel's ineffectiveness. Op. at 333. By putting forth this standard, the majority deviates from the words of the statute in two significant and insupportable ways.

First, the majority's invocation of a mere "reasonable probability" standard stands in plain contravention to the more stringent standard which the Legislature enacted in section 9543(a), which requires the unreliability of the adjudication of guilt, stemming from counsel's ineffectiveness, to be demonstrated by a "preponderance of the evidence." It is certainly possible to demonstrate that there is a reasonable probability that something is true without being able to demonstrate its truth by a preponderance of the evidence. Thus, the standard imposed by the majority is less exacting in degree than that imposed by the Legislature.

However, I am less concerned by the fact that the majority has lowered the *degree* of proof from that required by the statute itself than I am that the majority has altered the qualitative *nature* of the facts which must be proven as a predicate for relief. The majority focuses exclusively on whether the outcome of the proceedings would have been different but for counsel's ineffectiveness, overlooking the fact that the statute itself focuses on whether the reliability of the truth-determining process was compromised. Although at first blush these two concepts might seem coterminous, the United States Supreme Court has properly pointed out that there are instances in which counsel's ineffectiveness would have affected the outcome of the proceedings without rising to the level where it would have affected the integrity of the truth-determining process. In *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), the United States Supreme Court examined a situation in which trial counsel had been deemed ineffective for failing to object in a capital case to the use of the aggravating circumstance that the murder was committed in the course of a robbery. The facts which substantiated this aggravating circumstance had already been

used to establish the defendant's guilt at the underlying trial, in which the prosecutor had predicated guilt on a felony murder theory due to the fact that the murder was committed during a robbery. At the time, such "double-counting" of an aggravating circumstance at the penalty phase when it had already been used to establish an element of the crime at the guilt phase had been deemed unconstitutional in the Eighth Circuit.[1] Accordingly, collateral counsel established that a different result would have obtained in the sentencing proceeding but for trial counsel's ineffectiveness in failing to raise the "double-counting" issue, since only one aggravating circumstance had been established, and since that aggravator was legally invalid at the time of the sentencing proceeding. Nevertheless, the United States Supreme Court denied relief, stating as follows:

> Under our decisions, a criminal defendant alleging prejudice must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable ... *Thus, an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective.* To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him.

*Id.* at 369, 113 S.Ct. at 842–43 (emphasis added).

Thus, the United States Supreme Court has provided clear instruction that outcome determination and the reliability of the adjudication of guilt are two separate concepts and should be treated as such for purposes of a claim of ineffective assistance of counsel. Nevertheless, overlooking this clear admonition, the majority asserts: "Reliability of the adjudica-

---

1. By the time the appeal had advanced to the United States Supreme Court, the Eighth Circuit had reversed itself and held that "double-counting" an aggravating circumstance at the penalty phase was constitutionally permissible. However, the United States Supreme Court assumed that, at the time of the sentencing hearing in *Lockhart,* the defendant would have been entitled to relief on the double-counting issue under the applicable law.

tion of guilt or innocence and the probability that counsel's ineffectiveness caused a different outcome of the proceedings are concepts so closely intertwined and commonly-rooted in *Strickland* that we refuse to separate them." Op. at 333.

I believe that, in addition to the situation which confronted the United States Supreme Court in *Lockhart,* the majority overlooks a great number of other potential situations in which the ineffectiveness of trial counsel would not implicate the *reliability* of the process by which truth is determined, even though a different verdict would have obtained but for that ineffectiveness. For example, a situation could arise in which the prosecutor's central piece of inculpatory evidence, which demonstrated the guilt of the accused beyond all reasonable doubt, was obtained through execution of an overly broad search warrant. In such a situation, if trial counsel neglected to move for the suppression of such evidence, an appellate court could easily conclude that the outcome of the trial would have been different but for trial counsel's ineffectiveness in failing to move to suppress the evidence. However, the reason such evidence would be suppressed would *not* be that the admission of the evidence undermined the *reliability* of the process by which truth is determined, but rather that admission of evidence obtained through an overly broad search warrant implicated the defendant's privacy rights. Indeed, the admission at trial of such highly probative and relevant evidence would actually serve to *enhance* the reliability of the process by which truth is determined, even though it would properly be deemed excludible for reasons unconnected to the reliability of the truth-determination process.

In the context of the foregoing hypothetical, our Legislature has plainly determined that a collateral attack on judgment of sentence is not an appropriate vehicle for the vindication of privacy rights which are implicated by counsel's ineffectiveness, even if the violation of those rights would have resulted in dismissal of the charges had a timely motion to suppress been filed. Only in the narrow circumstances where counsel's ineffectiveness undermined the reliability of the process by

which the *truth* is ascertained does the proponent of collateral relief establish an entitlement to such relief under the PCRA.

By limiting ineffectiveness claims in this manner, the Legislature has carefully balanced the interests of convicted defendants with those of the Commonwealth. The Commonwealth has a compelling interest in achieving closure in criminal matters once the judgment of sentence has been affirmed on direct appeal, as such closure preserves the precious resources of both its law enforcement arm and its judicial arm, and also spares victims and their families the specter of never-ending collateral attacks based on procedural technicalities that do not implicate the defendant's actual guilt or innocence. At the same time, the Legislature has ensured that a convicted defendant is always provided a forum in which to demonstrate that counsel's ineffectiveness resulted in the conviction of an innocent person.[2]

In sum, I believe that the Legislature elected to narrowly confine ineffectiveness claims on collateral review, and that the Legislature acted well within its province by doing so, both constitutionally and also as a matter of policy. Because I believe that this Court has exceeded its proper role by neglecting to implement the standard which I believe the Legislature chose to employ in this context, I concur only in the result reached by the majority.[3]

---

**2.** It is important again to note that the Legislature did not have to provide such a forum at all. By tampering with the conditions that the Legislature placed on the statutory right of collateral review, this Court risks the possibility that the Legislature will eliminate the right altogether.

**3.** I note that the Legislature could easily cure the Court of the misapprehension under which I believe it is laboring by amending section 9543(a)(2)(ii) to provide for collateral relief only in those cases in which it is more likely than not that the ineffective assistance of counsel resulted in the conviction of an individual who is actually innocent in fact. There could be no misinterpreting such a clearly expressed standard, and, as explained at the outset of this Concurring Opinion, such a standard would not pose any constitutional problems.