

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-30-2005

# Beneshunas v. Klem

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-2469

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Beneshunas v. Klem" (2005). *2005 Decisions*. Paper 938.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/938

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

NO. 04-2469
_____

JOSEPH BENESHUNAS,

Appellant

v.

EDWARD KLEM; ATTORNEY GENERAL OF THE
COMMONWEALTH OF PENNSYLVANIA

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 02-1086)
District Judge: Honorable James F. McClure, Jr.

_____

Argued June 7, 2005

BEFORE: FUENTES, VAN ANTWERPEN and BECKER, <u>Circuit Judges</u>

(Filed: June 30, 2005 )

Jules Epstein (Argued)
Kairys, Rudovsky, Epstein & Messing, LLP
924 Cherry Street
Suite 500
Philadelphia, PA  19107

Counsel for the Appellant

James F. Menconi (Argued)
Assistant District Attorney
Schuylkill County Courthouse
401 North 2nd Street
Pottsville, PA 17901

Counsel for the Appellee

_____

OPINION
_____

VAN ANTWERPEN, Circuit Judge

Appellant Joseph Beneshunas appeals the decision of the District Court to deny his petition for habeas corpus relief. Beneshunas argues that his trial attorney was ineffective because he failed to object to the closing argument of the prosecutor who referenced Beneshunas's decision to end his interview with the police and invoke his right to an attorney once he learned that the woman he shot had died. For the reasons set forth below, we affirm.

## I. FACTS

Because we write only for the parties, we will recount only the relevant facts. Joseph Beneshunas shot and killed his former girlfriend, Vanessa Marie Bogo, in the early morning hours of May 29, 1995. Beneshunas confronted Bogo while she was returning to her temporary residence with some of her girlfriends. After a brief argument, Beneshunas fired five shots from a semi-automatic pistol. One shot struck Bogo in the hand; the other struck her in the head and proved fatal.

2

Following the shooting, Beneshunas was taken to the Shenandoah Police Department. After he was given his <u>Miranda</u> warnings, he executed a written waiver of his rights and gave the Police Chief an oral statement as to the events of the evening. When Beneshunas learned that Bogo had died, the interview terminated.

Beneshunas was charged with first-degree murder in the Court of Common Pleas, Schuylkill County, Pennsylvania. At trial, Beneshunas attempted to show that he did not have the requisite intent required for a first-degree murder conviction. During the trial, the prosecutor elicited testimony from Police Chief Reese that Beneshunas briefly discussed the events of the night of the shooting, but terminated the interview and asked for a lawyer when he learned that Bogo had died. Beneshunas's counsel objected to this line of questioning and the trial court sustained his objection.

Beneshunas then testified about his interview with Police Chief Reese and stated that it was Reese who suggested they end the interview. He stated that he never asked for a lawyer that night and just wanted to tell the police what happened.

During his closing argument, the prosecutor stated the following:

> He never said to him [the Chief], oh, I accidentally shot her. He didn't say anything like that to him. He asked a couple of times how Vanessa was. The chief didn't know. Subsequently it came to pass that she died, and he overheard that. What did he do then? What did he do? He asked for a lawyer. He terminated that interview. The chief didn't even get to the investigative time where you write down or have the defendant write down a statement. He didn't even get that far. The end, finished business. All the chief had was some notes as he was making as the defendant was talking. Didn't even come close to completing the interview, not even close. How about that as a factor to get inside the defendant's mind what he was thinking about that night.

> Let's look at some other things that I think go to show you the defendant's specific intent and whether or not he acted with malice that night . . . .

(Appellant App. at 29.) Beneshunas claims that these comments by the prosecutor were barred by <u>Griffin v. California</u>, 380 U.S. 609, 615 (1965), which held that "the Fifth Amendment, in its direct application to the Federal Government, and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."

However, at the time of his trial, Beneshunas's counsel did not object to the prosecutor's statements. Benshunas was convicted of first-degree murder and sentenced to life imprisonment. His trial counsel continued to represent him on direct appeal, but the courts denied relief.

Beneshunas then sought relief pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. §§ 9541-9546, and raised numerous issues, including the claim of ineffective assistance of counsel before this Court. During the evidentiary hearing, Beneshunas's trial counsel was questioned extensively about his failure to object to the prosecutor's closing statements regarding Beneshunas's invocation of the right to counsel. Beneshunas's trial counsel claimed that he believed he had opened the door for such a statement. He explained that part of his trial strategy was to suggest to the jury that the very damning statement allegedly given by Beneshunas to Reese was fabricated,

4

as evidence by the fact that Beneshuans did not sign it.

After an evidentiary hearing, the court denied relief. Beneshunas appealed to the Pennsylvania Superior Court and filed a Petition for Allowance of Appeal to the Supreme Court of Pennsylvania. After these routes proved unsuccessful, he filed a Petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Middle District of Pennsylvania. The matter was referred to a Magistrate Judge who issued a Report and Recommendation urging denial of the Petition.

On May 18, 2004, the District Court entered an order denying relief and adopting the Report and Recommendation of the Magistrate Judge. On August 25, 2004, this Court issued a limited Certificate of Appealability.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction over Beneshunas's habeas corpus petition pursuant to 28 U.S.C. § 2241. This Court has jurisdiction over the appeal by virtue of our grant of a Certificate of Appealability and 28 U.S.C. §§ 1291 and 2253. This Court granted a Certificate of Appealability "limited to the issue of whether trial counsel rendered constitutionally ineffective assistance by failing to object to the prosecutor's comments on his post-arrest silence and invocation of his right to counsel during closing argument."[1]

---

[1] This Court requested briefing on the question of whether a stand-alone Fifth Amendment claim was procedurally defaulted in state court. Counsel for the Appellant, in a swift and substantively correct letter brief, confirmed that the Fifth Amendment claim was not preserved by objection at trial and was not litigated on direct appeal.

5

We exercise plenary review over the District Court's legal conclusions in a habeas proceeding and apply a clearly erroneous standard to factual findings in dispute. Werts v. Vaughn, 228 F.3d 178, 191 (3d Cir. 2000).

## III. ANALYSIS

"[T]he writ of habeas corpus has historically been regarded as an extraordinary remedy, a bulwark against convictions that violate fundamental fairness. Engle v. Isaac, 456 U.S. 107, 126, 71 L. Ed. 2d 783, 102 S. Ct. 1558 (1982) (quoting Wainwright v. Sykes, supra, at 97 (STEVENS, J., concurring)). Those few who are ultimately successful [in obtaining habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation. Fay v. Noia, 372 U.S. 391, 440-441, 9 L. Ed. 2d 837, 83 S. Ct. 822 (1963)." Brecht v. Abrahamson, 507 U.S. 619, 633-634 (1993) (alterations in the original) (internal quotation marks omitted).

A petition for habeas corpus is governed by 28 U.S.C. § 2254, which states in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

Furthermore, he noted that Pennsylvania's Post-Conviction Relief Act does not allow a petitioner to raise a free-standing Fifth Amendment claim, but instead, those claims must come through an ineffectiveness claim. Counsel for the Appellee agreed that this was an accurate and objective statement of the law.

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

We may grant a writ under the "contrary to" clause if we conclude that the state-court decision contradicts the governing law as set forth by the Supreme Court, or differs from a decision of the Supreme Court made on materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause we may grant a writ if the state court identified the correct Supreme Court precedent, but applied it to the facts in an unreasonable manner. Id. at 413. "A federal habeas court may not grant relief under the 'unreasonable application' clause unless a state court's application of clearly established federal law was objectively unreasonable; an incorrect application of federal law alone does not warrant relief." Keller v. Larkins, 251 F.3d 408, 418 (3d Cir. 2001). We may also grant a writ under § 2254(d)(2) if the state court decision was based on an objectively unreasonable factual determination. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). With that understanding, we begin our examination.[2]

---

[2] The question in this appeal is whether defense counsel was ineffective because he failed to object to the prosecutor's closing argument. It is undisputed that the habeas standards discussed above apply in this examination. However, the state court's decision turned on an interpretation of the Fifth Amendment. We believe that the habeas standards apply to the state court's interpretation of the Fifth Amendment because it is necessary to its ineffective assistance claim. This reasoning is supported by the text of 28 U.S.C. § 2254(d)(1) which says that the unreasonable application clause applies where the state court decision "involved an unreasonable application of, clearly established Federal law."

7

## A. The Ineffective Assistance Inquiry

Relying on Commonwealth v. Kimball, 724 A.2d 326, 330 (Pa. 1999), the Superior Court determined that Beneshunas's counsel was not ineffective. In Kimball, the Supreme Court of Pennsylvania explained that:

> [t]he petitioner must still show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. This requires the petitioner to show: (1) that the claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and, (3) that, but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different.

Id.

We agree with the District Court that this standard comports with the leading Supreme Court case addressing ineffectiveness of counsel. In Strickland v. Washington, 466 U.S. 668, 687 (1984), the Supreme Court held that a petitioner seeking to have his conviction overturned because his counsel was ineffective must show both that his counsel was defective and that his defense was prejudiced by this defective performance. Pennsylvania's standard comports with the standard set forth by the Supreme Court in Strickland. Werts, 228 F.3d at 204.

Although the Superior Court identified the proper standard of review, Beneshunas claims that the Superior Court conducted no Strickland analysis, but based its decision on a presumption that "because trial counsel professed to have a strategy that it was, as a

_____

(emphasis added).

8

matter of fact and law, a reasonable one." (Brief of Appellant at 23.)  We disagree.

The first part of the <u>Strickland</u> analysis requires the reviewing court to determine "whether counsel's assistance was reasonable considering all of the circumstances." <u>Strickland</u>, 466 U.S. at 688.  We are cautioned that our evaluation should be highly deferential to counsel and that we must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  <u>Id.</u> at 689.

The Superior Court explained that counsel's failure to object during the prosecutor's closing argument was based, in part, on his belief that he had "legitimately 'opened the door' to that line of inquiry." (Appellant App. at 94.)  The Superior Court agreed that no Fifth Amendment violation occurred.  We therefore begin by examining the underlying Fifth Amendment issue.

**B. The Fifth Amendment Inquiry**

The Superior Court rested its decision on <u>Copenhefer v. Robinson</u>, 719 A.2d 242 (Pa. 1998) which in turn relied to the Supreme Court's decision in <u>United States v. Robinson</u>, 485 U.S. 25, 31 (1988).  In <u>Robinson</u>, the Court held:

> Where the prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence, <u>Griffin</u> holds that the privilege against compulsory self-incrimination is violated. But where as in this case the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel, we think there is no violation of the privilege.

<u>Id.</u> at 32.  The Superior Court explained that the prosecutor's statement in his closing was

a response to Beneshunas's testimony that he never asked for a lawyer and just wanted to tell the police what had happened. (Appellant App. at 94.)

Beneshunas argues that the Superior Court erred in two respects. First, Beneshunas claims that the Superior Court decision fails to mention that it was the prosecutor who first elicited testimony regarding Beneshunas's invocation of his rights. Second, he claims that the prosecutor's comments went beyond simply impeaching his testimony, but were used as substantive evidence to rebut the claim that the shooting was accidental. (Brief of Appellant at 24.)

### a. *The Prosecutor's Comments Were Properly Labeled a Response*

Beneshunas argues that the Superior Court's decision was based on an unreasonable factual determination because it describes the Prosecutor's closing argument as a "response" to Beneshunas's testimony. He points out that it was really the prosecutor who initially elicited testimony from the police chief regarding his request for a lawyer during questioning.

As a factual matter, the Superior Court did not err. The prosecutor made his closing statement after all of the evidence had been presented, including Beneshunas's testimony that he simply wanted to tell the police what happened. In that sense, the prosecutor's closing remarks were a "response" to Beneshunas's entire defense, including his testimony. The fact that certain matters first arose during the prosecutor's case-in-chief does not mean that his later reference to the defendant's theory is not a "response."

10

Furthermore, if the prosecutor "opened the door," Beneshunas kicked it down with testimony that went beyond any effort to rebut the statements made by the police chief. His trial strategy was to discredit Reese and demonstrate that he did not form the intent to kill and to that end he testified that he fully cooperated with the police. As the Superior Court explained:

> Regarding his cooperation with the police, appellant testified at trial on direct examination that "I never asked for a lawyer that night, never at any point." He contended that when the news of the victim's death arrived, "I broke down and started to cry and then Chief Reese said 'Benny, you better not say anything else until you get a lawyer.' I said okay." Appellant further asserted, "No, I never asked for a lawyer. He - I didn't even want a lawyer. I just knew - I knew what happened. <u>I just wanted to tell them what happened.</u>"

(Appellant App. at 92) (emphasis added). After the Court sustained an objection by defense counsel to the prosecutor's line of question, Beneshunas revisited his cooperation with the police in his own testimony. He didn't just deny that he requested a lawyer, but urged that he wanted to fully cooperate with the police. The Superior Court did not err in labeling the prosecutor's closing statement a "response."

For these same reasons, the fact that the prosecutor elicited testimony first does not change the legal consequences. The Superior Court found that the prosecutor's closing argument was a response to the Beneshunas's testimony that he cooperated with the police and therefore had no intent to kill. It concluded that under relevant Supreme Court precedent this was permissible. That the Superior Court found it irrelevant that the prosecutor first elicited testimony regarding Beneshunas's invocation of his rights is not

11

contrary to or, an unreasonable application of, Supreme Court precedent.

### b. *The Superior Court's Decision Regarding the Scope of the Comments Was Not Unreasonable*

In a more compelling argument, Beneshunas claims the prosecutor's closing did more than rebut his testimony; it encouraged the jury to infer guilt from his exercise of his right to counsel. (Brief of Appellant at 28.) Specifically, Beneshunas directs our attention to the prosecutor's statement, "How about that as a factor to get inside the defendant's mind what he was thinking that night. Let's look at some other things that I think go to show you the defendant's specific intent and whether or not he acted with malice that night . . . ." (Appellant App. at 29.) Beneshunas maintains that, taken in context, this can be read as nothing else but proof of state of mind.

Although Beneshunas raises a compelling issue, our review of the state court's decision is severely circumscribed. As stated above, we can only grant a habeas petition if the Superior Court's decision is contrary to the governing law as set forth by the Supreme Court, different than a decision of the Supreme Court made on materially indistinguishable facts, or an objectively unreasonable application of the correct Supreme Court precedent. Williams v. Taylor, 529 U.S. at 405-09. Accordingly, we turn to the relevant case law.

In Robinson, 485 U.S. at 31, the Court declined to "take the view that any 'direct' reference by the prosecutor to the failure of the defendant to testify violates the Fifth Amendment as construed in Griffin." The Court went on to explain:

12

"[The] central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, United States v. Nobles, 422 U.S. 225 (1975) . . . ." Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986). To this end it is important that both the defendant and the prosecutor have the opportunity to meet fairly the evidence and arguments of one another. The broad dicta in Griffin to the effect that the Fifth Amendment 'forbids . . . comment by the prosecution on the accused's silence,' 380 U.S., at 615, must be taken in the light of the facts of that case. It is one thing to hold, as we did in Griffin, that the prosecutor may not treat a defendant's exercise of his right to remain silent at trial as substantive evidence of guilt; it is quite another to urge, as defendant does here, that the same reasoning would forbid the prosecutor from fairly responding to an argument of the defendant by adverting to that silence. There may be some 'cost' to the defendant in having remained silent in each situation, but we decline to expand Griffin to preclude a fair response by the prosecutor in situations such as the present one.

Id. at 33-34.

It appears that the Court has not yet settled the question of whether a prosecutor may properly use the defendant's invocation of his rights as both a rebuttal to a statement by a defendant *and* substantive evidence of his guilt. Indeed, Justice Marshall raised concerns about this issue in his dissent in Robinson, when he stated:

the Court's suggestion that whether a comment violates Griffin depends on whether it is a response to the defense is muddled. A comment may well be a response to the defense and nevertheless be precisely the kind of statement that our holdings in Griffin and Wilson were designed to eliminate. If, for example, a defendant's counsel argues at trial that the defendant failed to take the stand in order to protect another person, and the prosecution responds that the true explanation is that the defendant is guilty as sin, the prosecution's comment responds to the defense, but it nevertheless invites the jury to infer guilt from the defendant's decision not to testify. Such a comment violates Griffin under any reasonable interpretation of that case.

Id. at 40-41 (footnote omitted).

In this case, the defense presented evidence that the defendant cooperated with the

13

police in order to encourage an inference as to his state of mind. The prosecution responded that the evidence did not support the claim that the defendant was completely cooperative with the police, and used this evidence to challenge the inference that the defense attempted to draw. In light of Robinson, we cannot say that the Superior Court was unreasonable in its holding that there was no Fifth Amendment violation.

Even if the Superior Court's decision was unreasonable, this is such a close question that we cannot say that trial counsel was defective. We must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 669. Defense counsel was trying to use his client's cooperation with the police as evidence of his mental state. At the closing argument stage of the trial, he would have had a difficult time making the case that the prosecutor had to curb his references to the same evidence he sought to use.

For the reasons set out above, we affirm the decision of the District Court.

BECKER, *Circuit Judge*, concurring in part and concurring the judgment.

I join in Judge Van Antwerpen's well-reasoned opinion except for part III.A.1.b, in which he concludes that there was no Fifth Amendment violation. I join in the judgment because the only issue certified for appeal is whether trial counsel rendered ineffective assistance in failing to object to the prosecutor's violation of Beneshunas's Fifth Amendment rights, and I agree with Judge Van Antwerpen that there was no ineffective assistance. The substantive Fifth Amendment claim was not raised at trial or on direct appeal and was waived for the purposes of state collateral review. Beneshunas is thus obliged to concede that any freestanding Fifth Amendment claim would be procedurally defaulted and unavailable in habeas, and to present it only as a part of his ineffective assistance claim. My discussion of the Fifth Amendment claim, like Judge Van Antwerpen's, is therefore subsidiary to my ultimate conclusions about ineffective assistance.

I.

My disagreement with the Opinion of the Court stems from its statement that "the [Supreme] Court has not yet settled the question of whether a prosecutor may properly use the defendant's invocation of his rights as both a rebuttal to a statement by a defendant *and* substantive evidence of his guilt." *Ante* at 12-13. But the Supreme Court's language is plain: "It is one thing to hold, as we did in *Griffin* [*v. California*, 380 U.S. 609 (1965)], that the prosecutor may not treat a defendant's exercise of his right to remain

15

silent at trial as substantive evidence of guilt . . . ." *United States v. Robinson*, 485 U.S. 25, 34 (1988). This makes it perfectly clear that a prosecutor may *not* use an invocation of rights as substantive evidence of guilt. This is just as true of post-arrest invocation of *Miranda* rights as it is of the invocation of the right not to testify at trial. The *Miranda* rights to silence and an attorney would be meaningless without a concomitant guarantee that using them will not harm the defendant. *See Doyle v. Ohio*, 426 U.S. 610, 617 ("[E]very post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested.").

I agree with Judge Van Antwerpen that the defense strategy invited comment and rebuttal by the prosecution. Beneshunas's defense was one of accident, and he presented substantial evidence of his nonculpable state of mind: he stayed at the scene after the shooting, attempted to aid Bogo, went quietly with police, and asked repeatedly about Bogo's health. He also testified that he had spoken freely with the police and that Chief Reese, not Beneshunas, had suggested that he get a lawyer after learning of Bogo's death. Beneshunas's testimony on these points was contradicted, to some extent, by Chief Reese's.

The prosecutor was thus well within his rights to comment in his closing arguments on this evidence. He had every right to suggest that Beneshunas's version of events was false, and even that Beneshunas's cooperation was woefully incomplete and hence was not as substantial evidence of innocence as the defense claimed. But his

16

latitude was limited to a fair reply: *Robinson*'s "invited response" doctrine "mean[s] that a prosecutor may neutralize improper defense arguments but may not rely on them as a 'springboard' for the launching of affirmative attacks upon the defendant[]. In other words, the doctrine's reach is limited to defensive, as opposed to offensive, conduct of the prosecutor." *United States v. Pungitore*, 910 F.2d 1084, 1126-27 (3d Cir. 1990) (citation omitted).

I have little doubt that the prosecution's comments here went well beyond the scope of a fair response. The disputed section of the closing argument barely mentions Beneshunas's testimony, or his contentions that he cooperated. Instead, the closing used Beneshunas's invocation of his rights as substantive evidence of his guilt: "He asked for a lawyer. He terminated that interview. . . . Didn't even come close to completing the interview, not close. How about that as a factor to get inside the defendant's mind what he was thinking that night." The very next sentence refers to "some of the things that I think go to show you the defendant's specific intent and whether or not he acted with malice that night." The prosecutor's meaning was clear: Beneshunas asked for a lawyer because he was guilty.

This impermissible and inflammatory use of Beneshunas's silence was a plain violation of the Constitution as interpreted by *Doyle* and *Robinson*. I would therefore hold that the state courts' contrary decision was an objectively unreasonable application of the precedents under the AEDPA standards. *See* 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529

17

U.S. 362, 405-09 (2000).

II.

Nonetheless, Beneshunas's habeas claim fails for the reasons set forth in the penultimate paragraph of the Opinion of the Court. While I conclude that the prosecutor's closing argument violated Beneshunas's Fifth Amendment rights, I agree that defense counsel's failure to claim such a violation was not an "error[] so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel objected to Chief Reese's direct testimony that Beneshunas had asked for a lawyer, but he apparently concluded that the closing argument was a fair response to Beneshunas's own testimony and was not therefore a Fifth Amendment violation. I note that this is the conclusion reached by several unanimous state courts and by four able and experienced federal judges: a Magistrate Judge, a District Judge, and two members of this panel.

More particularly, I agree with the Opinion of the Court that trial counsel made a "reasonable strategic decision" to which this Court should be "highly deferential." *Marshall v. Hendricks*, 307 F.3d 36, 85 (3d Cir. 2002). Defense counsel chose to focus on Beneshunas's cooperation with the police, and reasonably—although, I believe, wrongly—decided that the prosecutor's closing argument constituted an unobjectionable response to his strategy. Our ineffective assistance jurisprudence does not allow us to second-guess that decision.

18

Because I believe that Beneshunas's conviction was obtained in violation of his constitutional rights, I am deeply troubled by our decision not to grant a writ of habeas corpus. Nonetheless, although I regret that the posture of this case (and the applicable State procedures) compelled Beneshunas to wrap his persuasive Fifth Amendment claim in a less viable ineffective assistance argument, I am constrained to join in the judgment.