J-S89026-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JAMAL L. SMITH | |
| Appellant | No. 1103 EDA 2016 |

Appeal from the PCRA Order April 1, 2016
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0007676-2009

BEFORE:  SHOGAN, J., MOULTON, J., and FITZGERALD, J.[*]

MEMORANDUM BY MOULTON, J.:                    **FILED MARCH 15, 2017**

Jamal L. Smith appeals from the April 1, 2016 order of the Bucks County Court of Common Pleas denying his petition for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-46.  Smith's counsel has also filed with this Court a ***Turner/Finley***[1] no-merit letter and a petition to withdraw from representation.  We affirm the PCRA court's order and grant counsel's petition to withdraw.

On August 20, 2010, after a four-day trial, a jury convicted Smith of second-degree murder, robbery, and possession of an instrument of crime.[2]

_____

[*] Former Justice specially assigned to the Superior Court.

[1] ***Commonwealth v. Turner***, 544 A.2d 927 (Pa. 1988); ***Commonwealth v. Finley***, 550 A.2d 213 (Pa.Super. 1988) (*en banc*).

[2] 18 Pa.C.S. §§ 2502(b), 3701(a)(1)(i), and 907(a), respectively.

On October 14, 2010, the trial court sentenced Smith to an aggregate term of life in prison without the possibility of parole.

The PCRA court set forth the factual history underlying Smith's convictions in its May 10, 2016 opinion, which we adopt and incorporate herein. *See* Opinion, 5/10/16, at 1-12 ("1925(a) Op.").

Smith did not file post-sentence motions. On October 15, 2010, Smith timely appealed to this Court, which affirmed his judgment of sentence on March 29, 2012. On September 13, 2012, the Pennsylvania Supreme Court denied Smith's petition for allowance of appeal.

On October 18, 2012, Smith filed a *pro se* letter with the PCRA court, which the PCRA court treated as a timely PCRA petition. After the appointment of counsel, Smith filed amended PCRA petitions on March 4, 2013 and February 8, 2016.[3] On February 9 and March 28, 2016, the PCRA court held an evidentiary hearing at which Smith and his trial attorneys, Keith J. Williams and John Fioravanti, Jr., testified. On April 1, 2016, the PCRA court denied Smith's petition.

---

[3] Between the filing of the first and second amended PCRA petitions, the PCRA court ordered three mental health evaluations to determine whether Smith was competent to participate in the PCRA proceedings. The record shows that Smith suffers cognitive and hearing impairments and had the assistance of sign-language interpreters during the trial and PCRA proceedings. Each mental health evaluation resulted in a determination that Smith was competent to understand the proceedings against him and assist in his own defense. PCRA counsel also verified that he was "satisfied [that Smith] was competent to proceed with the PCRA proceedings." No-Merit Letter at 8 (unpaginated).

On April 7, 2016, Smith filed a timely notice of appeal. On April 11, 2016, the PCRA court directed Smith to file a Pennsylvania Rule of Appellate Procedure 1925(b) statement of errors complained of on appeal within 21 days. In lieu of a Rule 1925(b) statement, Smith's PCRA counsel filed a Rule 1925(c)(4) statement, notifying the court that he intended to file a no-merit letter and a petition to withdraw from representation due to the lack of meritorious issues for appeal. Thereafter, on July 5, 2016, counsel filed with this Court a no-merit letter and a petition to withdraw from representation.

Before we may address the merits of Smith's appeal, we must determine whether his PCRA counsel has satisfied the requirements for withdrawal under **Turner**/**Finley**. Counsel must

> file a "no-merit" letter detailing the nature and extent of his review and list[ing] each issue the petitioner wishes to have examined, explaining why those issues are meritless. The PCRA court, or an appellate court if the no-merit letter is filed before it, then must conduct its own independent evaluation of the record and agree with counsel that the petition is without merit.

**Commonwealth v. Rykard**, 55 A.3d 1177, 1184 (Pa.Super. 2012) (internal citation omitted). Counsel also must serve copies of the petition to withdraw and no-merit letter on the petitioner and advise the petitioner that he or she has the right to proceed *pro se* or with privately retained counsel. **Commonwealth v. Widgins**, 29 A.3d 816, 818 (Pa.Super. 2011).

In his no-merit letter, PCRA counsel states that he reviewed the record and applicable law, identified the issues Smith wished to raise, and explained why those issues are meritless. He also mailed a copy of the petition and

no-merit letter to Smith and informed Smith of his right to proceed *pro se* or with private counsel.[4] We conclude that PCRA counsel has complied with the dictates of **Turner**/**Finley**.

Because Smith did not file a *pro se* brief or a brief by private counsel, we will address the merits of the claims raised by PCRA counsel.

PCRA counsel has identified two issues for appeal: (1) whether trial counsel were ineffective "for not presenting a defense based on the victim's having tried to rob [Smith], causing [Smith] to use a knife in self-defense against the victim, resulting in the victim's death"; and (2) whether trial counsel were ineffective "for not discovering [or] removing the influence of [Smith's family], which exercised undue influence on [Smith] to avoid presenting a defense that he acted in self-defense when he killed the victim." Second Am. PCRA Pet., ¶¶ 2(b), (c); *see* No-Merit Letter at 6 (unpaginated).

Our review of an order denying PCRA relief is limited to determining "whether the decision of the PCRA court is supported by the evidence of record and is free of legal error." **Commonwealth v. Melendez–Negron**,

---

[4] Counsel's initial letter to Smith incorrectly advised Smith that he had the right to proceed *pro se* or with new counsel if this Court agreed with counsel's position that the issues on appeal lack merit. Therefore, on July 28, 2016, we directed counsel to file with this Court "a letter addressed to [Smith] advising him of his immediate right to proceed *pro se* or with privately retained counsel" within 14 days. Super. Ct. Order, 7/28/16. Counsel complied and filed a revised letter with this Court on July 28, 2016. The letter states that counsel mailed the letter to Smith on the same day.

123 A.3d 1087, 1090 (Pa.Super. 2015). We will not disturb the PCRA court's factual findings "unless there is no support for [those] findings in the certified record." *Id.*

To prevail on a claim of ineffective assistance of counsel, a PCRA petitioner must show that: (1) the underlying claim has arguable merit; (2) counsel had no reasonable, strategic basis for his or her act or omission; and (3) but for counsel's act or omission, there is a reasonable probability that the outcome of the proceedings would have been different. *Commonwealth v. Kimball*, 724 A.2d 326, 333 (Pa. 1999). Counsel is presumed to be effective, and the petitioner has the burden of proving each of the three prongs by a preponderance of the evidence. *Commonwealth v. Steckley*, 128 A.3d 826, 831 (Pa.Super. 2015), *app. denied*, 140 A.3d 13 (Pa. 2016).

Smith first argues that his trial counsel were ineffective for failing to present a self-defense theory to the jury when Smith allegedly had told counsel before trial that he had stabbed the victim because the victim was trying to rob him.

In a July 18, 2009 interview with police, Smith described the incident as follows:

> [Smith] stated that he intended on getting some money from the [victim] but the [victim] told him that he did not have any money . . . . [Smith] stated that he pulled out a small folding knife and the [victim] pulled out a brown switch blade. The [victim] then turned in his seat and began kicking [Smith] in the face causing a cut under [Smith's] eye. [Smith] dropped his knife and was holding his hands up to his face when the [victim] tried to stab

him. [Smith] was able to grab the [victim's] arm preventing [him] from stabbing him. As they struggled over the knife [Smith] turned his back slightly to the [victim] and the [victim] bit [Smith] on the left back/shoulder blade. They continued to struggle over the knife until [Smith] was able to pull the knife out of the [victim's] hand. In the course of wresting the knife out of the [victim's] hand [Smith] received a small laceration to the web of his left hand. . . .

As they continued to struggle [Smith] stabbed the [victim] in the leg and also admitted to stabbing the [victim] in the front shoulder, two times in the back and three times in the chest/stomach area. [Smith] stated that he stabbed the [victim] so many times because he was scared because the guy had tried to stab him.

Trial Ct. Op., 6/10/11, at 7 (quoting Smith's 7/18/09 statement).

At trial, however, Smith contested the validity of his July 18, 2009 statement to police, stating that "[h]e was popping pills and high during the interview." *Id.* at 14. Smith also denied killing the victim and testified "that a 'Blood' gang member by the name of Corey Talley a.k.a. Corey Mills committed the murder." *Id.* at 13. Smith testified that "he initially told police that Mills committed the murder, but later told police that [Smith] did it because he was scared for his safety and the safety of his family," because Mills had threated to kill Smith if he told anyone. *Id.* at 14.

At the PCRA hearing, Smith testified that before trial, he informed one of his trial counsel, Williams, that he had stabbed the victim because the victim was trying to rob him. N.T., 3/28/16, at 25-26. Williams, however, testified that Smith denied stabbing the victim and told him that Corey Talley had killed the victim. *Id.* at 48. Williams also testified that he had advised Smith before trial that "the story he told the police might lead to a

- 6 -

better verdict," *id.* at 49, but Smith still denied killing the victim. Smith's other trial counsel, Fioravanti, also testified that Smith never admitted that he had killed the victim. *Id.* at 63.

We agree with the PCRA court that because Smith denied killing the victim, his attorneys had a reasonable, strategic basis for not presenting a self-defense theory to the jury.[5] Furthermore, as the PCRA court found, "[e]ven if counsel had presented such a defense, the outcome of the proceedings would not have been different due to the overwhelming evidence presented at trial." 1925(a) Op. at 17-18. We conclude that the record supports the PCRA court's findings.

Next, Smith argues that trial counsel were ineffective for failing to remove the undue influence of his family. This claim lacks merit.

After hearing the testimony of Smith and his trial attorneys at the hearing, the PCRA court found:

> According to [Smith], his mother threatened him and told him that if he told the truth during trial, she would kill his kids. Besides this alleged threat, [Smith] testified that his mother said she "could get the reward money" if the appellant lied. He testified that his mother also told him not to say anything when she visited [Smith] at prison. No evidence was presented to support these bald assertions. Thus, without more, [Smith's] underlying claim is meritless.

---

[5] At the PCRA hearing, Smith testified that he had lied to the jury when he denied killing the victim and implicated Corey Talley in the murder. N.T., 3/28/16, at 40-41.

According to Mr. Williams, although [Smith's] mother did not believe that her son killed the victim and might have influenced her son because of this belief, she "tried to be as cooperative as she could be under the circumstances." Moreover, when [Smith] met with his lawyers with his mother present, she did not tell [him] what to say at trial. However, when [Smith] met with his lawyers alone, he still failed to admit to killing the victim.

1925(a) Op. at 18-19 (citations omitted). The PCRA court credited the testimony of Williams and Fioravanti and discredited Smith's testimony. Because the record supports the PCRA court's credibility determinations, we are bound by them. **See Commonwealth v. Roane**, 142 A.3d 79, 86 (Pa.Super. 2016). Accordingly, we conclude that the PCRA court properly denied Smith's PCRA petition.

Order affirmed. Petition to withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/15/2017

- 8 -

IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA  :  No. CP-09-CR-0007676-2009

                      :

      V.                   :

                      :

JAMAL L. SMITH            :

## O P I N I O N

On appeal, the appellant, Jamal L. Smith, challenges this Court's April 1, 2016 Order

denying relief under the Post Conviction Relief Act (hereinafter "PCRA"). The appellant's

PCRA Counsel has filed a Statement Pursuant to Pa.R.App.Pro. 1925(c)(4) due to lack of any

meritorious issues supporting the appellant's appeal. This Court files this opinion pursuant to

Pennsylvania Rule of Appellate Procedure 1925(a).

## I.    FACTS AND PROCEDURE

The following is a summary of the relevant facts and procedural history as set forth in our

opinion filed on June 10, 2011:

> . . . In the early morning hours on July 8, 2009, Debra Reynolds called police to report a dead body lying outside of a white Jeep in the parking lot of the Marion Village Apartment Complex. N.T. 8/17/10, p. 29. Located between the Delaware Canal, Edgely Road, and Bristol Pike (Route 13) in Bristol Township, Bucks County, Pennsylvania, this apartment complex is described as a high-drug, high-crime area. N.T. 8/18/10, p. 105; N.T. 8/17/10, pp. 26, 57; Exhs. C-10, C-11, C-12. Officer Peter Hollenczer, an officer with the Bristol Township Police Department who has twenty-two years of experience, responded to the call. N.T. 8/17/10, pp. 25-26.
>
> Upon his arrival, Officer Hollenczer found an elderly white male lying outside of a white Jeep with one leg still inside the driver's door of the vehicle. N.T. 8/17/10, p. 26; Exhs. C-1, C-6, C-7. The body was directly in front of the 800 building. N.T. 8/17/10, p. 51. As the officer approached, he saw blood around the stomach and neckline, but could not see any apparent injuries. N.T. 8/17/10, p. 27; Exhs. C-1, C-6, C-7, C-8. The man did not have a pulse and the rescue squad confirmed that he was, in fact, deceased. N.T. 8/17/10, pp. 27-28.

1

Reynolds, her son, Joseph Slater, and his fiancée, Amanda Cliver, told police that they did not know what had happened. N.T. 8/17/10, pp. 30-31.

At 5:47 a.m., William O'Keefe, a detective with the Bristol Township Police Department who has seventeen years of experience, responded to the parking lot of the apartment complex for a possible homicide investigation. N.T. 8/17/10, pp. 49-50, 67. The victim's body was still located between the white Jeep and black BMW and it was covered with a white sheet. N.T. 8/17/10, pp. 51-52; Exhs. C-4, C-5, C-6, C-7, C-8. The coroner showed police multiple stab wounds on the victim's back. N.T. 8/17/10, p. 56; Exh. C-9. No wallet was found on the victim. N.T. 8/17/10, p. 56.

The Jeep and nearby black BMW were secured and taken to the Bristol Township Police evidence garage. N.T. 8/17/10, pp. 65-66.

Police investigation revealed that the victim was a homeless man by the name of John "Jack" Reil. N.T. 8/17/10, pp. 35, 67; Exhs. C-2, C-15. Reil had permission to sleep in his friend Susan Kowalick's 1989 white Jeep Cherokee. N.T. 8/17/10, pp. 34-35, 37; Exh. C-3. Kowalick resides in the 800 building of the apartment complex and parked her Jeep directly outside of her apartment's windows. N.T. 8/17/10, pp. 34, 37. When Kowalick last saw Reil at 7:30 a.m. on July 7, 2009, she gave him ten dollars, which he put in his wallet. N.T. 8/17/10, p. 45.

On July 14, 2009 and July 15, 2009, Bristol Township Police Department Detectives Gregory Beidler and Jack Slattery, who possess twenty-two years and seven years of experience respectively, secured a search warrant and searched the white Jeep and black BMW. N.T. 8/18/10, pp. 205, 210-11, 213; N.T. 8/17/10, p. 217; Exhs. C-57, C-60, C-61, C-64. Timothy Fuhrman, a detective with the Bristol Township Police Department who has twenty years of experience, also assisted with the processing of the vehicles. N.T. 8/19/10, pp. 64-66.

The two-door Jeep had two front seats that were separated by a floor-mounted gear shifter and a rear bench seat. N.T. 8/18/10, p. 216. The Jeep contained a large amount of blood in the front passenger area. N.T. 8/18/10, p. 216; N.T. 8/17/10, p. 63; Exhs. C-13, C-14, C-57, C-61. Blood was located on both front seats, both door panels, the headliner, and the backseat. N.T. 8/18/10, pp. 216-17; N.T. 8/17/10, p. 63; Exhs. C-13, C-14, C-57, C-61. The passenger's side door of the Jeep was locked. N.T. 8/19/10, p. 106.

Police recovered fingerprints from the vehicles. Fingerprints were found on the Jeep's driver's door interior window. N.T. 8/18/10, pp. 220-23; Exhs. C-53, C-56, C-60. Police also recovered prints on the exterior of the BMW and the exterior of the Jeep's passenger side. N.T. 8/19/10, pp. 68-69, 71-72; N.T. 8/18/10, p. 231.

2

The victim's wallet was not recovered from the Jeep. N.T. 8/18/10, pp. 211, 227.

On July 17, 2009, police interviewed Joseph Slater. N.T. 8/18/10, p. 180. During the interview Slater broke down, started crying, and told police what happened on the night of the murder. N.T. 8/17/10, p. 107. Because Slater is dyslexic, police memorialized the interview into a statement which Slater amended and then signed. N.T. 8/18/10, p. 181; Exh. C-17. The statement is as follows:

> Joseph was interviewed at the Bristol Township Police Station at 1340 hours. Joseph was told that during a previous interview he stated that he went to the Seven Eleven on July 8, 2009, at approximately 3:00 a.m. Joseph was told that the video surveillance from Seven Eleven proved that he did not go to the Seven Eleven that night. Joseph then said he went to the Ball Park Tavern but found the bar was closed. Joseph said he lied because he did not want his wife to know he was going to the Ball Park. Again Joseph was told that we did not believe his story.
>
> Joseph then started tearing up and stated I just need to tell you "Maly" did it. Joseph said Maly admitted to me that he stabbed the guy.
>
> Joseph was told to explain what happened that night. Joseph said he was outside of building 800 at about 8:00 p.m. the night before the murder (July 7) with his fiancée, Amanda. Joseph said Maly came up and started hanging out with them and Joseph asked Amanda and Maly if they wanted to go to the Ball Park to buy some beer. Joseph said the three walked to the Ball Park and Amanda was pushing her stroller with their daughter. Amanda waited outside with their daughter and Joseph and Maly went inside and purchased three forty ounce bottles of beer. They all walked back to building 800 and sat outside on the step drinking beer. Joseph said Maly pulled a knife out of his side pocket. Joseph stated that Maly said that if he was fighting with someone, he would stab them, while making stabbing motions with the knife. Joseph stated that Maly then dropped the knife on the ground accidentally. Joseph said he told Maly to put the knife away because he was drunk and Maly put the knife in his right front pocket. Joseph described the knife as seven or eight inches long, with a wood handle and silver blade.
>
> Joseph said sometime that night "Boo Boo" and "Man Man" were outside with them and Joseph wanted to buy some weed. Joseph said that Maly initially attempted to buy weed from the 900 building of the apartment complex, but was unable to. Joseph said Man Man went over by building 500 and purchased a dime bag of weed. Joseph said he and Man Man smoked the weed. Joseph said he

3

thinks Man Man and Boo Boo went back inside of their apartment about fifteen minutes before his daughter was bumped by the door. Joseph said either a lady or heavy set guy opened the door of building 800 and struck his daughter in the head. Joseph said he grabbed his daughter and went inside apartment 803 and asked his mother to drive them to the hospital. Joseph said they walked past Maly as they were leaving for the hospital and Maly asked if he could go. When told he couldn't go Joseph said Maly looked sad and lost.

Joseph said he, his mother, fiancée and their daughter all left Lower Bucks Hospital together at about 3:00 a.m. Joseph said they drove directly back to the apartment and went inside. Joseph said they were up talking and at about 4:00 a.m. they heard a light tapping on the door. Joseph said that his mother initially answered the door, but no one was there. Joseph said that he then went to the door and did not see anyone around. Joseph said he was going to go out to smoke a cigarette anyway and when he was outside of his apartment, Maly appeared from the laundry room on the same floor. Joseph said Maly was motioning for Joseph to come to him and when Joseph walked down to the laundry room Maly asked him to come inside. Joseph said he was a little nervous about going inside because it was dark and he didn't know what Maly was up to. Joseph said he went inside and Maly kept repeating to Joseph that he just killed somebody. Joseph said he asked Maly why he killed this person and Maly kept saying that he grabbed me as he was showing Joseph his neck and pulling his collar from his neck area. Joseph said he did not notice any injuries on Maly's neck and he asked Maly why he didn't just run away. Joseph said Maly said he couldn't get away and I stabbed him.

Joseph said he could see the end of a knife handle sticking out of Maly's back pocket. Joseph said he asked Maly what it was and he said nothing. Joseph said he asked again and Maly pulled the knife he seen Maly with earlier from his back pocket. Joseph said the knife was in the open position and the blade and most of the handle was wrapped in a tan Dickies button up work shirt. Joseph said he saw Maly wearing the Dickies shirt earlier that day. Joseph said Maly then unwrapped the knife and put the knife, on top of the shirt, on the floor of the laundry room in front of the washer. Joseph said he could see a little blood on the blade of the knife as well as blood transfer from the blade on the shirt. Maly stated that there was also blood on Maly's left hand on the blade of his palm. Joseph said that Maly pointed out of the laundry room windows in the direction of the parking lot when asked where this happened. Joseph said Maly told him it happened by the white car. Joseph stated that Maly asked

4

him to come out to the parking lot to see the victim. Joseph advised that he stated that he did not want to see anything and told Maly that he should leave. Joseph said Maly wrapped the knife back in the shirt and put the knife in his back pocket still in the opened position. Joseph said Maly asked him several times if he would tell on him and asked Joseph not to tell on him. Joseph said that Maly stated "I don't like when people tell on me." Joseph described Maly as nervous, shaken up and that he was pacing back and forth and banging his head on the walls of the laundry room. Joseph said Maly was wearing a maroon thermal shirt, dark three quarter length jean shorts and black and green sneakers.

Joseph said he walked Maly out of the building and told him to just go as he pointed left, telling Maly to leave the apartments. Joseph said he went back to the apartment and told Amanda and his mother Debra what Maly just told him. Joseph said his mother continued to say she does not believe Maly would do such a thing. Joseph said he and his fiancée, Amanda walked out in the parking lot and discovered the body by the white Jeep. Joseph said the two immediately became upset and went back to his mother and told her Maly did it and you need to call the police. Joseph said he never made contact with the victim or the vehicle; however he did see the victim in the parking lot the day before at about 7:00 p.m. and shook the victim's hand. Joseph asked if he touched the outside of the vehicle at all and Joseph said he does not think he did.

Joseph described Maly as a short deaf black male and thinks his real name is Jamal. Joseph said they call him Maly. Joseph was shown a photograph of Jamal Smith and identified him as Maly.

*Signed* Joseph W. Slater IV, 7/17/09, 4:46 p.m.

I, Joseph Slater, swear and affirm that the above statement is an accurate summary of my interview with Bristol Township Detectives William O'Keefe and Jack Slattery on Friday, July 17, 2009.

Exh. C-17.

Slater resides with this mother in the 800 building of the complex. N.T. 8/17/10, pp. 32, 81. Slater's nickname is "Cheech." N.T. 8/17/10, p. 80. Slater met the defendant, whom he called "Maly" at the apartment complex a few weeks prior. N.T. 8/17/10, pp. 80-81. Slater spoke to police several times after the 911 call was made, but did not initially tell them about his conversation with the defendant because he lived in a "rough area" and he was scared for the safety of his family.

5

N.T. 8/17/10, pp. 104-07. The day after the murder, Slater said he received a gang sign threatening his life. N.T. 8/17/10, p. 112.

On July 17, 2009, at approximately 9:30 p.m., Detective Beidler arrested Defendant and transported him to police headquarters. N.T. 8/17/10, pp. 217-18. Defendant was placed in a holding cell and because police knew Defendant had a hearing impairment, police called two certified sign language interpreters. N.T. 8/18/10, pp. 20-25, 53-56; N.T. 8/17/10, p. 218; Exhs. C-27, C-28, C-29, C-30. When the two interpreters arrived they established communication with the defendant through the use of sign language. N.T. 8/18/10, pp. 25-28, 56-58; N.T. 8/17/10, p. 221. Defendant then agreed to an interview and through the assistance of the interpreters gave a voluntary statement to police in a Lieutenant's office, which was memorialized in a signed written statement. N.T. 8/18/10, pp. 28-34, 58-63; N.T. 8/17/10, pp. 222-55; Exhs. C-18, C-19, C-20, C-21, C-23. That statement is as follows:

> Jamal Smith was interviewed at the Bristol Township Police station at about 0030 hours on July 18, 2009. Also present during the interview were Joy Harris and Cren Quigley who are certified sign language interpreters. Detective Jack Slattery was also present during the interview. At 0041 hours Jamal was advised of his Miranda rights. Jamal understood these rights and he agreed to talk to us without a lawyer present. Jamal acknowledged receiving his Miranda rights by signing the rights form from which his warnings were read.
>
> In summary Jamal stated that on July 8, 2009, he was in the parking lot of the Marion Village Apartment complex. He saw a black female who he knows to be a prostitute who goes by the name of "Brown Sugar". Brown Sugar got into a jeep occupied by a white male that was parked in front of the 800 building. The black female and the white male sat in the jeep and smoked crack and "fucked". While they were in the jeep the white male was sitting in the passenger front seat while the black female sat in the front driver's seat. After about thirty minutes the black female opened the driver's door and exited, leaving the door open as she walked away.
>
> Jamal walked up to the driver's door and got into the driver's seat. Jamal stated that he intended on getting some money from the white male but the white male told him that he did not have any money because the black female took $60.00 from him. Jamal stated that he pulled out a small folding knife and the white male pulled out a brown switch blade. The white male then turned in his seat and began kicking Jamal in the face causing a cut under Jamal's eye. Jamal dropped his knife and was holding his hands up to his face when the white male tried to stab him. Jamal was able to grab the

white males arm preventing the male from stabbing him. As they struggled over the knife Jamal turned his back slightly to the white male and the white male bit Jamal on the left back/shoulder blade. They continued to struggle over the knife until Jamal was able to pull the knife out of the white male's hand. In the course of wresting the knife out of the white male's hand Jamal received a small laceration to the web of his left hand. Jamal described the cut as small and stated that it bled only a little bit.

As they continued to struggle Jamal stabbed the white male in the leg and also admitted to stabbing the white male in the front shoulder, two times in the back and three times in the chest/stomach area. Jamal stated that he stabbed the white male so many times because he was scared because the guy had tried to stab him. Jamal exited the car and ran up to apartment 803 where a person he knows as "Cheech" resides. After knocking on Cheech's door, Cheech came out into the hallway and the two talked by the laundry room. During this conversation Jamal told Cheech that he had just stabbed a white male out in the parking lot.

Jamal then left Cheech and exited the apartment building. After leaving the apartment he threw the knife into a trash dumpster that is in the parking lot in front of 800 building. Jamal then ran to his grandmother's house at 1221 Marie Lowe Drive.

Jamal stated that at the time of the incident he was wearing a light brown shirt and light gray long shorts. Jamal stated that he did have blood on his shorts but his shirt did not have any blood on it. Jamal did not know what happened to the clothes he was wearing at the time but he thinks that his brother may have thrown the clothes away.

Jamal stated that he did not intend to kill the guy when he initially approached the jeep. He only intended on getting some money from the white male.

I have reviewed my statement as summarized and typed by Detective Greg Beidler of the Bristol Township Police Department. I find the facts contained in this statement to be a true, correct, and accurate accounting of my statement to him. I gave and signed this statement voluntarily without promise, threat or duress.

*Signed* Jamal Smith, 7/18/09, 5:16 a.m.

Exh. C-23. After the interview, Detective Beidler photographed the areas of Defendant's body where he indicated he was injured. N.T. 8/17/10, pp. 256-59;

7

Exhs. C-24, C-25, C-26. Although Detective Beidler could see a mark on the defendant's right chest, he "could not tell how that mark was made." N.T. 8/17/10, pp. 258-59.

On July 18, 2009, Bristol Township Police Department Detective Michael Slaughter, who has thirteen years of experience, executed a search warrant at the defendant's grandmother's home, 1221 Marie Lowe Drive in Bristol Township. N.T. 8/18/10, pp. 94-97; Exh. C-33. During the search police recovered twelve items including a stained reddish maroon thermal long sleeve shirt and pair of "blue jean Capri" pants which were located on the front porch. N.T. 8/18/10, pp. 97-98; Exhs. C-16, C-32, C-33. Detective Slaughter described the home as being packed with items. N.T. 8/18/10, pp. 99-100. Clothing was everywhere and it was a challenge to clear out each room. N.T. 8/18/10, pp. 99-100.

On August 10, 2009, Detective O'Keefe interviewed Shawna Lynch, another resident of the Marion Village Apartment Complex. N.T. 8/18/10, pp. 197-99. On July 8, 2009, at approximately 2:30 a.m., Lynch saw Defendant outside of the 800 building. N.T. 8/17/10, p. 199. Lynch said that Defendant did not live in the apartments, but often hung out there. N.T. 8/17/10, p. 205. Lynch observed the defendant walk around the Jeep and look in the windows. N.T. 8/17/10, pp. 212-13. Lynch saw someone in the passenger side of the Jeep at that time. N.T. 8/17/10, p. 204.

Lynch and the defendant discussed Reil while standing alongside of the 800 building. N.T. 8/17/10, pp. 200, 202; Exh. C-11. Defendant told Lynch that he was going to rob Reil and Lynch stated "leave him alone. He doesn't have anything. He's homeless. He doesn't have anything." N.T. 8/17/10, pp. 200, 203, 207.

During the trial, Defendant identified Lynch as a prostitute named "Brown Sugar." N.T. 8/19/10, pp. 174-75; Exh. C-68. However, Lynch testified during the trial that she is not a prostitute and did not smoke crack cocaine with Reil. N.T. 8/17/10, pp. 206-07.

On August 8, 2009, while incarcerated at the Bucks County Correctional Facility and awaiting trial, Defendant called his family. N.T. 8/18/10, p. 127; Exhs. C-34, C-35. Defendant spoke to three people during this call and discussed his incarceration, his upcoming court dates, and told someone to go into the bathroom; Defendant's family then instructed him to stop speaking. Exhs. C-34, C-35. It should be noted that this call took place by telephone without the assistance of interpreters or assistive listening device equipment. At times Defendant asked for words to be repeated but he was able to communicate by telephone.

After hearing this call, on August 13, 2009, Detective O'Keefe executed a second search warrant at the defendant's grandmother's home. N.T. 8/18/10, pp. 170-73.

8

Detective O'Keefe, who was also present during the search on July 18, 2009, testified that the bathroom had been cleared out, the vanity was empty, and that the closet in the bathroom was completely empty. N.T. 8/18/10, p. 174; Exhs. C-46, C-47. Detective O'Keefe testified that only the bathroom had been cleared out and the remaining rooms in the home appeared the same as they had on July 18, 2009. N.T. 8/18/10, pp. 177-78; Exhs. C-48, C-49. During this search police recovered Defendant's signed library card. N.T. 8/18/10, pp. 176-77; Exh. C-50. Defendant's photo identification card and other paperwork revealed his address to be his grandmother's house. N.T. 8/18/10, pp. 180, 207; Exhs. C-51, C-52.

On January 14, 2010, the Commonwealth filed a Notice of Aggravating Circumstances. On January 15, 2010, Defendant was arraigned. On June 7, 2010, Defendant filed an Omnibus Pre-Trial Motion. On June 30, 2010, a hearing was held on the pre-trial motions. On July 9, 2010, this Court denied Defendant's suppression motion by written order. Prior to trial, the Commonwealth withdrew its intention to seek the death penalty.

On August 16, 2010, a jury was selected. Also on August 16, 2010, counsel filed a stipulation, "Jamal Smith has no functional hearing in his right ear and limited ability to hear in his left ear." We note that during every proceeding, Defendant was provided with two sign language interpreters. Additionally, on August 13, 2010, Defendant was afforded the opportunity to test the assistive listening device in the courtroom, which he wore during the entire trial.

During the defendant's trial, Ian Hood, M.D., a forensic pathologist and expert in forensic pathology, testified. Exh. C-42. On July 8, 2009, Dr. Hood performed an autopsy on Reil's body and determined the cause of death to be multiple stab wounds. N.T. 8/18/10, pp. 139, 163; Exhs. C-43, C-44. Dr. Hood testified that Reil was a thin man and that he was approximately six feet tall and weighed one hundred and fifty pounds. N.T. 8/18/10, pp. 132, 139, 144. Dr. Hood found eighteen stab wounds and two scratches on the victim's body. N.T. 8/18/10, pp. 158-59; Exh. C-43.

Reil was stabbed twelve times in the back. N.T. 8/18/10, pp. 146-47; Exhs. C-38, C-39, C-43. Eleven of the twelve stab wounds on the victim's back penetrated approximately one to two inches until they hit the rib bone, and one stab wound penetrated four inches until it went through the chest wall and into the victim's lung. N.T. 8/18/10, pp. 147-48, Exh. C-43.

The victim also had multiple stab wounds on his chest. Exh. C-43. Two wounds were located close to the victim's right armpit. N.T. 8/18/10, pp. 152-53; Exh. C-40. The one wound was located three inches below the victim's right armpit, and penetrated until it hit a rib bone. N.T. 8/18/10, p. 153; Exh. C-40. The other wound, the widest stab wound, penetrated at least four inches deep into the lobe of the victim's right lung and caused it to collapse. N.T. 8/18/10, pp. 152-53; Exh. C-40. The victim also had two stab wounds on the left side of his chest.

9

Exh. C-41. One stab wound penetrated four inches deep into the lower abdomen wall causing a significant hemorrhage of the left liver lobe amounting to approximately twenty cubic centimeters (cc). N.T. 8/18/10, pp. 154-55; Exh. C-41. Additionally, the most forceful and rapidly fatal stab wound was over the breast bone, where penetration went straight backwards, through the bone, and into the heart. N.T. 8/18/10, p. 155; Exh. C-41.

The victim also had a one inch stab wound on his right lower leg, where the knife stopped when it hit the bone. N.T. 8/18/10, pp. 142-43; Exh. C-36. Additionally, Reil had a two to three inch deep stab wound in his left middle upper arm area which was consistent with a knife entering and traveling upward and stopping when it hit the bone. N.T. 8/18/10, pp. 144-45; Exh. C-37.

Dr. Hood testified that all of the stab wounds were about one-half inch to three-quarters of an inch in length and were made by a knife that had a relatively thin blade. N.T. 8/18/10, p. 143. Several of the stab wounds had slightly torn ends. N.T. 8/18/10, p. 143. This is consistent with movement between the knife and the victim. N.T. 8/18/10, p. 143. Dr. Hood noted that the stab wound which entered the heart was rapidly fatal, but that the combination of the other wounds would have proven fatal as the wounds penetrated the victim's chest and punctured his lungs and liver. N.T. 8/18/10, p. 156.

A toxicology report revealed that the victim's blood alcohol concentration was 0.224%, but no controlled substances were found in his system. N.T. 8/18/10, pp. 162-63; Exh. C-45.

Counsel stipulated that "serology testing was done on the red thermal shirt seized by Bristol Township Police Department at 1221 Marie Lowe Drive. The serology testing confirmed the presence of blood on the front, back, sleeves, and inside cuffs of the red thermal shirt seized from 1221 Marie Lowe Drive." N.T. 8/19/10, p. 5.

Forensic Scientist, Lisa Shutkufski, an expert in DNA analysis, testified during the trial. N.T. 8/19/10, pp. 6-51; Exh. C-62. Shutkufski is a DNA analyst with the Pennsylvania State Police, and has over ten years of experience. N.T. 8/19/10, pp. 6-7.

Shutkufski testified that the DNA profiles obtained from the left sleeve, left cuff, and right sleeve of the red thermal shirt found on Defendant's front porch matched the DNA profile of the victim, Reil. N.T. 8/19/10, pp. 16-18. Shutkufski further testified that the probability of randomly selecting an unrelated individual with this combination of DNA types is approximately one in 470 quintillion (470,000,000,000,000,000,000) from the Caucasian population, one in 910 sextillion (910,000,000,000,000,000,000,000) from the African American population, and one in 14 sextillion (14,000,000,000,000,000,000,000) from the Hispanic population. N.T. 8/19/10, pp. 16-17. Shutkufski further testified that

10

since there are only six billion people in the world, this figure is larger than the world's population. N.T. 8/19/10, p. 17.

Shutkufski also testified that the DNA profiles found on the left sleeve, left cuff, and right sleeve of the red thermal shirt were consistent with a mixture of DNA. N.T. 8/19/10, p. 18. She opined that this is not unusual because it is common for multiple sources to come into contact with one item. N.T. 8/19/10, p. 18. Shutkufski also testified that the DNA profile found on another portion the left cuff was not a mixture and it was consistent with the victim's DNA. N.T. 8/19/10, p. 19.

Shutkufski also tested the shirt for the presence of Defendant's DNA and found other portions where the defendant's DNA could not be excluded. N.T. 8/19/10, p. 20. Shutkufski explained that if someone was wearing an undershirt under the red thermal shirt or if the red thermal shirt had been washed the amount of DNA found on the shirt would be reduced. N.T. 8/19/10, p. 47.

Detective Fuhrman, an expert in fingerprint and palm print analysis and identification, testified during the trial. N.T. 8/19/10, pp. 52, 62; Exh. C-63. Detective Fuhrman testified as to the presence of Defendant's fingerprints and palm print. The defendant's fingerprints and palm print were found on the exterior passenger side of the Jeep, to the left of the passenger door's handle. N.T. 8/19/10, pp. 83-86, 94-100, 103; Exhs. C-66, C-69. The defendant's fingerprints were also found on the interior window of the Jeep's driver side door and on the front right fender of the BMW. N.T. 8/19/10, pp. 81, 86-87, 92-94, 100-101, 103; Exhs. C-54, C-55, C-56, C-65, C-67.

Defendant testified during the trial. N.T. 8/19/10, pp. 157-201. Defendant denied killing Reil and stated that a "Blood" gang member by the name of Corey Talley a.k.a. Corey Mills committed the murder and the following is the defendant's version of the events. N.T. 8/19/10, pp. 159, 163-64, 192. He said he was hanging out at the 800 building, with Slater and his girlfriend drinking and smoking but they had to go to the hospital because their daughter got injured. N.T. 8/19/10, pp. 165-66. He said he stayed behind and was drinking a beer when Mills approached him and told him he wanted to show him something. N.T. 8/19/10, pp. 159-60, 166-67. Mills told him that he stabbed someone while trying to rob him and showed him the body that had fallen out of the white Jeep. N.T. 8/19/10, pp. 160-61, 163. He checked the man's neck to see if he was alive. N.T. 8/19/10, p. 161. Mills threatened to kill him and his family if he told anyone. N.T. 8/19/10, p. 163. Further, after he was threatened, he went to Slater's apartment building and told Slater in the laundry room about what had happened. N.T. 8/19/10, pp. 167, 194-96. He said that Mills followed him home that night and again threatened him on his front porch. N.T. 8/19/10, pp. 168-70. Mills then took off his shirt and left it on the front porch. N.T. 8/19/10, p. 170; Exh. C-32. On the night of his arrest he initially told police that Mills committed the murder, but later told police he did it because he was scared for his safety and the

11

safety of his family. N.T. 8/19/10, pp. 171-73. After the interview, the interpreters did not go over his statement with him, but instead were playing on their phones. N.T. 8/19/10, p. 182. He was popping pills and high during the interview. N.T. 8/19/10, pp. 189-90. During the recorded call from the prison, he was telling his uncle to get money and crack out of the bathroom. N.T. 8/19/10, p. 197. He admitted to seeing Shawna Lynch the night of the murder, but stated that he did not tell her that he was going to rob someone and she did not see him circle around the Jeep. N.T. 8/19/10, pp. 175-76. He confirmed that the day after the murder he was riding around the apartment complex on Mills' motorcycle. N.T. 8/19/10, pp. 177-79.

The following stipulations were placed on the record:

> On January 12, 2009, the defendant, Jamal Smith, was convicted of robbery on criminal information 7203 of 2008 for an incident that occurred in Bristol Township, Bucks County on July 8, 2008. The robbery did not involve a weapon.

> On January 11, 2008, the defendant, Jamal Smith, was convicted of a retail theft on criminal information 2135 of 2007 for an incident that occurred in Tullytown Borough, Bucks County, Pennsylvania on December 16, 2006.

N.T. 8/19/10, pp. 205-06.

On August 20, 2010, after a four-day trial, the jury returned a verdict of guilty on the charges of Second-Degree Murder, Robbery,[1] and Possessing a Criminal Instrument.[2] N.T. 8/20/10, pp. 93-96.

On October 14, 2010, Defendant received a total sentence of life imprisonment without the possibly of parole and a concurrent two and one half years to five years in a state correctional facility. N.T. 10/14/10, p. 25. Specifically, Defendant was sentenced to life imprisonment for Count 1, the murder of John "Jack" Reil. N.T. 10/14/10, p. 25. Defendant received a concurrent sentence of two and one half years to five years for Count 3, Possessing a Criminal Instrument. N.T. 10/14/10, p. 25. No further penalty was imposed for Count 2, Robbery, as it merged with Count 1. N.T. 10/14/10, p. 25.

Trial Court Opinion, 6/10/11.

---

[1] 18 Pa.C.S. § 3701(a)(1)(i).

[2] 18 Pa.C.S. § 907(a).

12

No post-sentence motions were filed. On October 15, 2010, the appellant filed a Notice of Appeal to the Superior Court. On March 28, 2012, the Superior Court affirmed this Court's judgment of sentence. On September 13, 2012, the Supreme Court of Pennsylvania denied the appellant's Petition for Allowance of Appeal.

On March 4, 2013, the appellant filed a Motion to Amend Defendant's PCRA Petition. On February 8, 2016, the appellant filed the Second Motion to Amend Defendant's PCRA Petition, and PCRA hearings were held on February 9, 2016 and March 28, 2016. On April 1, 2016, the appellant's PCRA Petition was denied. On April 7, 2016, the appellant filed a Notice of Appeal to the Superior Court.

## II.  STATEMENT PURSUANT TO PA.R.APP.PRO. 1925(c)(4)

The appellant relies on the following grounds for his PCRA Petition:

[First,] the counsel was ineffective under the 6th and 14th Amendments to the United States Constitution, in Article 1, Section 9 of the Pennsylvania Constitution, for not presenting a defense based on the victim having tried to rob the defendant causing the defendant to use a knife in self-defense against the victim resulting in the victim's death.

[Second,] the counsel was ineffective under the 6th and 14th Amendments to the United States Constitution, in Article 1, Section 9 of the Pennsylvania Constitution, for not discovering and not removing the influence of the defendant's family, which exercised undue influence on the defendant to avoid presenting a defense that he acted in self-defense when he killed the victim.

N.T. 2/9/16, pp. 9-10. It should be noted that the issue with respect to suppression of the appellant's statement was withdrawn. N.T. 3/28/16, pp. 43, 53.

On April 15, 2016, the appellant's PCRA counsel, Stuart Wilder, filed a Statement Pursuant to Pa.R.A.P. 1925(c)(4) as follows, *verbatim*:

Pursuant to the Court order directing the filing of a statement pursuant to Pa.R.App.Pro. 1925(b), notice is hereby given Pursuant to Pa.R.App.Pro.

13

1925(c)(4) that the undersigned will be filling a no merit letter and and petition to withdraw as counsel pursuant to Commonwealth v. Finley, 479 A.2d 568 (Pa. Super. 1984) and its progeny with the Superior Court, and therefore will not be filing a statement of matters complained of, due to the lack of any meritorious issues supporting the Defendant's appeal.

## III.    DISCUSSION

Pa.R.A.P. 1925(c)(4) permits counsel in a criminal case to file a statement of intent to withdraw in lieu of filing a statement of matters complained of on appeal. Specifically the Rule provides as follows:

> In a criminal case, counsel may file of record and serve on the judge a statement of intent to file an *Anders/McClendon* brief in lieu of filing a Statement. If, upon review of the *Anders/McClendon* brief, the appellate court believes that there are arguably meritorious issues for review, those issues will not be waived; instead, the appellate court may remand for the filing of a Statement, a supplemental opinion pursuant to Rule 1925(a), or both. Upon remand, the trial court may, but is not required to, replace appellant's counsel.

Pa.R.A.P. 1925(c)(4). The appellant's PCRA counsel of record filed such a statement of intent under Rule 1925(c)(4), and we concur that no meritorious issues support the appellant's appeal.

The standard of review regarding the dismissal of a petition for post-conviction relief is "whether the determination of the PCRA court is supported by evidence of record and is free of legal error." Commonwealth. v. Burkett, 5 A.3d 1260, 1267 (Pa. Super. Ct. 2010) (citations omitted). "[The] scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the trial level." Id. The Superior Court "may affirm a PCRA court's decision on any grounds if it is supported by the record." Id. "Where the petitioner raises questions of law, [the] standard of review is *de novo* and [the] scope of review plenary." Commonwealth v. Ford, 44 A.3d 1190, 1194 (Pa. Super. Ct. 2012).

14

To be eligible for PCRA relief, a petitioner must plead and prove by a preponderance of the evidence that his or her conviction or sentence resulted from one or more of the circumstances enumerated in 42 Pa.C.S. § 9543(a)(2). The Petitioner must also establish that the claims of error raised in the PCRA petition "[have] not been previously litigated or waived" and that "the failure to litigate the issue prior to or during trial, during unitary review or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel." 42 Pa.C.S. § 9543(a)(3) and (4). An issue has been waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state post[-]conviction proceeding." 42 Pa.C.S. § 9544(b). An issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." 42 Pa.C.S. § 9544(a)(2).

Here, both claims of the appellant concern ineffective assistance of counsel. Claims arising from ineffective assistance of counsel are cognizable under § 9543(a)(2)(ii) of the PCRA, which requires the petitioner to "plead and prove . . . [t]hat the conviction or sentence resulted from . . . [i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place."

> To prevail in a claim of ineffective assistance of counsel, a petitioner must overcome the presumption that counsel is effective by establishing all of the following three elements, as set forth in Commonwealth v. Pierce, 515 Pa. 153, 527 A.2d 973, 975–76 (1987): (1) the underlying legal claim has arguable merit; (2) counsel had no reasonable basis for his or her action or inaction; and (3) the petitioner suffered prejudice because of counsel's ineffectiveness. With regard to the second, reasonable basis prong, we do not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had any reasonable basis. We will conclude that counsel's chosen strategy lacked a reasonable basis only if Appellant proves that an alternative not chosen offered a potential for success substantially greater than the course actually pursued. To establish the third, prejudice prong, the

15

petitioner must show that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's ineffectiveness. Commonwealth v. Paddy, 15 A.3d 431, 442 (Pa. 2011) (internal citations and quotations omitted).

During the PCRA hearing, the appellant provided a new version of the incident. According to the appellant, he was walking on the street, and the victim came up to him, brandished a knife and directed him to get in the car. N.T. 3/28/16, p. 20. The victim managed to get money from the appellant, who then tried to get his money back. N.T. 3/28/16, p. 14. After the victim stabbed, kicked and bit the appellant, the appellant stabbed him, and the fight continued. N.T. 3/28/16, pp. 14, 21. When the fight ended, the victim was "standing" "outside" the car and "moving." N.T. 3/28/16, p. 21.

The appellant claims that his counsel was "ineffective for not presenting a defense based on the victim having tried to rob him causing him to use a knife in self-defense against the victim resulting in the victim's death." The appellant's claim fails because he did not present sufficient evidence to satisfy the three requirements set forth in Pierce. The appellant voluntarily denied the killing to his lawyers, and they were unable to present such a defense. During the PCRA hearing, the appellant admitted that he lied to the jury at trial:

BY MR. SWEENEY:

Q. Jamal, are you now admitting that you killed John Reil?

A. Yeah, but I didn't really mean to kill John Reil.

Q. Do you remember testifying in the jury trial back in 2010?

A. Yes.

Q. Do you remember telling the jury that you did not kill John Reil?

A. Yes.

16

Q. So when you told the jury that, that was a lie?

A. Could you repeat that?

Q. When you told the jury that you did not kill John Reil, was that a lie?

A. Yes.

Q. Do you remember telling the jury that Cory Tally killed John Reil?

A. Yes.

. . .

Q. When you told the jury that Cory Tally killed John Reil, was that the truth or was that a lie?

A. A lie, yes.

Q. Do you remember telling the jury that Cory Tally threatened you and your family?

A. Yes.

Q. And that, in fact, was also a lie, correct?

A. Yes.

N.T. 3/28/16, pp. 40-41. When the appellant was asked why he lied, he said, "I was scared." N.T. 3/28/16, p. 27. Before the pre-trial hearing, the appellant told Keith Williams, his trial counsel, that Cory Tally killed the victim. N.T. 3/28/16, p. 30. Mr. Williams testified that the appellant never admitted to killing the victim. N.T. 3/28/16, p. 48. Furthermore, Mr. Williams told the appellant that "the story that he told the police might lead to a better verdict." N.T. 3/28/16, p. 49. John Fioravanti, Jr., the appellant's co-counsel, testified that the appellant never adopted the statement he gave to the police. N.T. 3/28/16, p. 63.

As demonstrated above, trial counsel had a reasonable basis not to present the defense asserted by the appellant during the PCRA hearing. Even if counsel had presented such a

17

defense, the outcome of the proceedings would not have been different due to the overwhelming evidence presented at trial. For example, Shawna Lynch, a resident of the Marion Village Apartment Complex, testified that in the early morning hours of July 8th of 2009, on the side of 800 building, the appellant stopped Lynch when she walked up, and told her that he was going to rob Reil. N.T. 8/17/10, pp. 199-200. During the trial, Dr. Hood described the eighteen stab wounds and two scratches which were found on the victim's body. N.T. 8/18/10, pp. 158-59. One stab wound penetrated four inches into the lower lobe of the victim's right lung and caused it to collapse. N.T. 8/18/10, p. 153. One stab wound went through the bone and into the heart. N.T. 8/18/10, p. 153. However, the appellant testified during the PCRA hearing that when the fight ended, Reil was "standing" "outside" the car and "moving." N.T. 3/28/16, p. 21. Thus the evidence supported the appellant's statement given to the police, but it contradicted the appellant's account given in the PCRA hearing.

The appellant next claims that his counsel was ineffective for not discovering and not removing the undue influence of his family. According to the appellant, his mother threatened him and told him that if he told the truth during trial, she would kill his kids. N.T. 3/28/16, p. 32. Besides this alleged threat, he testified that his mother said she "could get the reward money" if the appellant lied. N.T. 3/28/16, p. 31. He testified that his mother also told him not to say anything when she visited the appellant at prison. N.T. 3/28/16, p. 36. No evidence was presented to support these bald assertions. Thus, without more, the appellant's underlying claim is meritless.

According to Mr. Williams, although the appellant's mother did not believe that her son killed the victim and might have influenced her son because of this belief, she "tried to be as cooperative as she could be under the circumstances." N.T. 3/28/16, p. 51. Moreover, when the

18

appellant met with his lawyers with his mother present, she did not tell the appellant what to say at trial. N.T. 3/28/16, p. 49. However, when the appellant met with his lawyers alone, he still failed to admit to killing the victim. N.T. 3/28/16, p. 42.

## IV. CONCLUSION

For the foregoing reasons, we respectfully submit that the issues raised are without merit, and therefore, the appeal should be denied.

DATE: *May 10, 2016*

BY THE COURT,

_____
REA B. BOYLAN, J.